UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

ANTHONY HOLBROOK, Individually and On Behalf of
All Others Similarly Situated,

                        Plaintiff,

        v.

TRIVAGO N.V., ROLF SCHRÖMGENS, AXEL HEFER,
NATIONAL CORPORATE RESEARCH, LTD., J.P.
MORGAN SECURITIES, LLC, GOLDMAN, SACHS &
CO., MORGAN STANLEY & CO. LLC, ALLEN &
COMPANY LLC, MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED, CITIGROUP
GLOBAL MARKETS INC., DEUTSCHE BANK
SECURITIES INC., COWEN AND COMPANY, LLC,
and GUGGENHEIM SECURITIES, LLC,

                      Defendants.

------------------------------------------------------------------- X

17 Civ. 08348 (NRB)

**ORAL ARGUMENT
REQUESTED**

# DEFENDANT TRIVAGO'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

      A.    Overview Of trivago's Business ............................................................... 3

      B.    trivago's IPO And Registration Statement ......................................... 4

      C.    trivago's Repeated Disclosures Concerning The Relevance Assessment And Its Impact On trivago's Financial Performance ......................... 5

      D.    The Filing Of This Action And The CAC ......................................... 9

ARGUMENT .................................................................................................................. 9

    I.    The CAC's Securities Act Claims Fail Because Plaintiff Does Not Allege Any Actionable Misrepresentations Or Duty To Disclose At The Time Of The IPO .................................................................................... 10

      A.    The CAC's Vague Allegations About The Timing Of The Relevance Assessment Fail To Plead It Existed And Could Be Disclosed In The Registration Statement .................................................................... 10

      B.    The CAC's Assertion That The Registration Statement Should Have Predicted The Precise Impact Of The Relevance Assessment In Subsequent Quarters Is Impermissible Fraud By Hindsight .............. 11

      C.    The Statements In The Registration Statement That The CAC Alleges Should Have Disclosed The Relevance Assessment Were Either True Or Non-Actionable Forward-Looking Statements ................................. 13

      D.    The CAC Fails To Allege An Actionable Omission In The Registration Statement Under Item 303 Regarding The Relevance Assessment Or Priceline ........................................................................................... 15

    II.    The CAC's Exchange Act Claims Must Be Dismissed Because Plaintiff Fails To Plead Scienter Or Any Actionable Misrepresentations ................................. 16

      A.    The CAC Fails To Raise Any Inference Of Scienter, Let Alone Plead Particularized Facts Establishing A Strong Inference Of Scienter .... 17

         1.    The CAC Does Not Allege Any Motive Or Opportunity To Defraud ................................................................................. 17

i

2.	The CAC's Conclusory Allegations Of Conscious Misbehavior Or Recklessness Fail To Raise An Inference Of Scienter ..... 18

3.	Any Weak Inference Of Scienter Is Neither Cogent Nor Compelling ............................................................................. 20

B.	The CAC Does Not Adequately Plead Any Misstatements Or Omissions In Support Of Its Exchange Act Claims ............................................ 21

1.	Statements Regarding The Fourth Quarter Of 2016 ............. 21

2.	Statements Regarding The First Quarter Of 2017 ................. 22

3.	Statements Regarding The Second Quarter Of 2017 And Subsequent Guidance Downgrade ......................................... 25

CONCLUSION .................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Alki Partners, L.P. v. Vatas Holding GmbH,*
    769 F. Supp. 2d 478 (S.D.N.Y. 2011).........................................................10

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................9-10, 11, 18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007)..............................................3, 16, 17

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)..........................................................23

*City of Monroe Emps. Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.,*
    No. 10 Civ. 2835 (NRB), 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011)...............20, 24

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.,*
    967 F. Supp. 2d 771 (S.D.N.Y. 2013).....................................*passim*

*DeMaria v. Andersen,*
    153 F. Supp. 2d 300 (S.D.N.Y. 2001), *aff'd,* 318 F.3d 170 (2d Cir. 2003).............24

*Denny v. Barber,*
    576 F.2d 465 (2d Cir. 1978)..............................................9

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)...........................................................17

*Foley v. Transocean Ltd.,*
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)....................................17-18, 19

*Footbridge Ltd. v. Countrywide Home Loans, Inc.,*
    No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)...............19-20

*Halperin v. eBanker USA.com, Inc.,*
    295 F.3d 352 (2d Cir. 2002).............................................22, 23

*In re BHP Billiton Ltd. Sec. Litig.,*
    276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017) ...............................15, 16

**Page(s)**

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ............. 12, 14, 22

*In re ForceField Energy Inc. Sec. Litig.*,
    No. 15 Civ. 3020 (NRB), 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017)................ 12

*In re MGT Capital Invs., Inc. Sec. Litig.*,
    No. 16 Civ. 7415 (NRB), 2018 WL 1224945 (S.D.N.Y. Feb. 27, 2018) ............... 23

*In re Open Joint Stock Co. Vimpel-Commc'ns*,
    No. 04 Civ. 9742 (NRB), 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006)................. 12

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)...................................................... 22, 23-24

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014)........................................................ 12

*Kelter v. Apex Equity Options Fund, L.P.*,
    No. 08 Civ. 2911 (NRB), 2009 WL 2599607 (S.D.N.Y. Aug. 24, 2009) ............... 16

*Lopez v. Ctpartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016)........................................................ 24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................. 12

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013)..................................................... 18

*Scott v. Gen. Motors Co.*,
    46 F. Supp. 3d 387 (S.D.N.Y. 2014)...................................................... 11

*Singh v. Schikan*,
    106 F. Supp. 3d 439 (S.D.N.Y. 2015).................................................. 10, 11, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................... 16-17

**Rules and Statutes**

15 U.S.C. § 77k(a) ...................................................................................... 10, 13

**Page(s)**

15 U.S.C. § 78u-4 ............................................................................. 16

17 C.F.R. § 229.303(a)(3)(ii) .............................................................. 15

Fed. R. Civ. P. 9(b) .......................................................................... 16

Defendant trivago N.V. ("trivago" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss the Consolidated Amended Class Action Complaint (the "CAC").

## PRELIMINARY STATEMENT

Between August and October 2017, trivago, an online hotel booking company, announced disappointing financial results.  In making these announcements, the Company attributed its results, in part, to a change it made to its search algorithm months earlier:  the so-called "relevance assessment," under which advertisers whose websites did not satisfy trivago's standards were required to bid more to maintain their placement in trivago's search results.  As the Company disclosed at the time and before, the relevance assessment initially caused an increase in its revenue (as advertisers with lower relevance assessments bid more to obtain a higher ranking in trivago's search results), but this increase was temporary (as advertisers modified their websites to satisfy trivago's standards).  As anticipated, trivago's revenue declined between June and September 2017, but by more than trivago originally projected.

Seizing on these developments, the CAC alleges with the benefit of hindsight that every prior disclosure by trivago was misleading (and even intentionally so) on the theory that it failed to predict the exact scope and timing of the relevance assessment's impact on its financial results.  In fact, the CAC goes so far as to allege that the registration statement for trivago's December 2016 initial public offering ("IPO") was likewise misleading because it failed to disclose the relevance assessment's future impact on financial results, even though the CAC does not allege that the relevance assessment existed at that time.  The CAC is thus a textbook example of impermissible fraud by hindsight, and should be dismissed for several reasons.

*First*, the claims asserted in the CAC under the Securities Act of 1933 (the "Securities Act") must be dismissed because Plaintiff fails to adequately allege that the registration

1

statement issued in connection with the IPO contained any disclosures that were false when made.  To the contrary, the CAC fails to allege that the relevance assessment even existed at the time of the IPO, such that it could have been disclosed in the registration statement, and merely contends the Company misled investors because it failed to anticipate future events and make disclosures earlier than it did.  Moreover, even if the relevance assessment existed at the time of the IPO, there are no false or misleading statements because the specific disclosures identified as false in the CAC are either plainly true or non-actionable under the bespeaks caution doctrine.

*Second*, the CAC's claims under the Securities Exchange Act of 1934 (the "Exchange Act") fail because they do not raise any inference—let alone the requisite strong inference—of scienter.  Indeed, the CAC is conspicuous for its failure to contain any factual allegations that trivago possessed undisclosed information contradicting its public statements at the time made, and instead relies on a series of conclusory assertions that the Company acted "knowingly" and "recklessly."  Such boilerplate legal conclusions plainly fail to satisfy the applicable heightened pleading standards.  Further, the inference of scienter that the CAC seeks to draw is neither "cogent" nor "compelling."  To the contrary, it is absurd.

*Third*, the CAC's Exchange Act claims also fail for the independent reason that Plaintiff does not adequately plead any misstatements or omissions.  Instead, the CAC frequently quotes statements without alleging any facts to demonstrate that those statements were untrue or advances allegations that this Court has directly rejected as insufficient on many prior occasions, including because they are based on fraud by hindsight, fail to identify any duty to disclose the allegedly omitted information, challenge non-actionable forward-looking statements, and ignore the Company's disclosures about the very issues the CAC alleges were omitted.

For these reasons, the CAC should be dismissed with prejudice in its entirety.

## STATEMENT OF FACTS

### A.  Overview Of trivago's Business

trivago is an internet company based in Germany that develops and operates a metasearch engine for hotel rooms.  CAC ¶ 4.  trivago's "platform allows travelers to make informed decisions by personalizing their hotel search and providing access to a deep supply of hotel information and prices."  Ex. 1 (Prospectus) at 1.[1]  The Company's website connects hotel advertisers with consumers in over 55 countries and 33 languages.  *Id.*

trivago generates revenue by charging hotel advertisers to list their hotels on trivago's platform on a "cost-per-click basis," meaning that trivago is paid for each click it generates.  CAC ¶ 46.  trivago has developed a search result ranking algorithm that considers multiple factors to determine a hotel offer's placement in its search results, including the offered rate for the room, the likelihood the offer matches the user's search criteria, and the cost-per-click amount paid by the advertiser.  CAC ¶ 47.  In reporting its financial results, trivago not only discloses common financial measures like revenue and net income, but also publishes other metrics that provide additional insight into the Company's performance.  CAC ¶ 51.  These other metrics include the number of its "qualified referrals," meaning the number of unique visitors that click through to an advertiser's website per day, and its "revenue per qualified referral" (or "RPQR"), which represents its total revenue generated from clicks to advertiser websites divided by the total number of qualified referrals in a given period.  CAC ¶¶ 52-53.

---

[1]   All references to an "Ex." are to exhibits to the Declaration of Jared Gerber, dated May 14, 2018.  In ruling on a motion to dismiss, a court "may consider . . . statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

**B. trivago's IPO And Registration Statement**

In late 2016, trivago conducted an IPO.  In connection with its IPO, trivago filed Forms F-1 on November 14, 2016 and December 5, 2016, a Form F-6 on December 6, 2016, and a prospectus on December 16, 2016 (collectively, the "Registration Statement").  CAC ¶¶ 54-57. These documents described trivago's business and the risks associated with that business.

As relevant here, the Registration Statement disclosed that pricing was determined through a competitive bidding process whereby advertisers bid on their placement priority for a specific hotel offering; it also disclosed that trivago makes frequent changes to its search algorithm.  In fact, on page one of the prospectus, trivago stated that it "continually test[ed] new features" and "refin[ed] our search algorithms."  Ex. 1 (Prospectus) at 1; *see also id.* at 102 (same).  The Registration Statement likewise disclosed that the Company "aim[ed] to continuously optimize our search algorithms," *id.* at 109, and "employ[ed] a rigorous iterative approach" to developing "the proprietary algorithm underlying our search function, internal management tools, data analytics and advertiser tools."  *Id.* at 113.

With respect to revenue, the Registration Statement disclosed trivago's historical revenue figures and noted that its revenue had increased in 2015 and 2016, but warned that the Company "may not be able to maintain our historical growth rates in future periods."  *Id.* at 21.  In particular, the Registration Statement noted that "[r]evenue growth may slow or revenues may decline for any number of reasons," *id.*, including if the Company did not "continue to innovate and provide tools and services that are useful to users and advertisers."  *Id.* at 28.

Similarly, with respect to trivago's customers, the Registration Statement warned that the Company "generate[d] most of our revenue from a limited number of [online travel agencies]." *Id.* at 76.  With respect to one particular customer, Priceline, the Registration Statement disclosed in four separate places that "[t]he Priceline Group and its affiliated brands . . . accounted for 27%

and 43% of our total revenue for the nine months ended September 30, 2015 and 2016, respectively." *Id.* at 23, 76, 111; *see also id.* at F-11.  Moreover, the Registration Statement bluntly warned that the Company "could be adversely affected by our advertiser concentration," including because "[t]he loss of any major customer . . . could result in significant decreases in revenue, as well as an increase in credit losses, and have a material adverse effect on our business, results of operations, financial condition and prospects." *Id.* at 23-24.

The Company's IPO was completed on December 16, 2016.  CAC ¶ 57.

### C. trivago's Repeated Disclosures Concerning The Relevance Assessment And Its Impact On trivago's Financial Performance

In December 2016, trivago instituted a change to its search algorithm called the "relevance assessment." CAC ¶ 12.  Unlike its prior landing page policy, under which an advertiser allegedly could be banned from advertising on the site "unless its landing page was up to trivago's user experience standards," CAC ¶ 9, the new relevance assessment allegedly decreased an advertiser's score (and the prominence of its hotels in search results) if its landing pages did not conform to trivago's standards, unless the advertiser "bid[] more per click." CAC ¶ 12.  The CAC alleges that this change "had a temporary and substantial positive impact on trivago for a portion of the Class Period (especially the first half of 2017)," as advertisers (including Priceline) bid more to maintain their search result prominence, but subsequently led to a decrease in earnings "at the end of Q2 2017" as advertisers "began to conform to trivago's landing page requirements" and "no longer had to pay the 'poor relevance assessment score penalty' to obtain the same priority in search results." CAC ¶¶ 15-16.  But the Company itself disclosed these risks and dynamics as they were happening during the relevant period.

Initially, during the February 24, 2017 conference call discussing trivago's fourth quarter and full year 2016 financial results—*i.e.*, the first financial results after the implementation of the

relevance assessment—the Company's CFO, Axel Hefer, stated that RPQR had increased in the Americas because trivago was "continuously optimiz[ing] our marketplace algorithm" to "try out new things." Ex. 2 (Q4 2016 Conference Call) at 6.  Hefer warned, however, that it was "very difficult . . . to forecast whether these changes are temporary or lasting" because "it takes some time to see" their impact.  *Id.*  Hefer further advised investors that "it is a bit difficult" to predict the subsequent impact of the algorithm changes because "some of these [changes] . . . show a little [] effect in the short-term and then normalize over time as there is just an initial reaction of the advertisers, and then they get used to it in a way and the bidding is normalizing."  *Id.* at 7.  In its annual report issued on March 9, 2017, the Company again disclosed that it was "continually test[ing] new features" and "refin[ing] our search algorithms."  Ex. 3 (2016 20-F excerpt) at 40.

Subsequently, in its first quarter 2017 financial results released on May 15, 2017, trivago explained that its RPQR had "increased by 4% compared to the first quarter of 2016" and attributed this growth to "the introduction of a relevance assessment in our marketplace algorithm in December 2016."  Ex. 4 (Q1 2017 Press Release) at 3.  The results further explained that, "[i]n some cases, advertisers have compensated for their lower relevance assessments through higher cost-per-click bids," but warned that "[w]e expect that, as advertisers optimize their websites and bidding strategy, these positive revenue effects will be partially mitigated over time."  *Id.*  During the conference call discussing these results, Hefer and trivago's CEO Rolf Schrömgens likewise described the relevance assessment and stressed that "the positive effect that we have now seen in Q4 and Q1" was "partially driven by higher volatility by [its] initial introduction."  Ex. 5 (Q1 2017 Conference Call) at 5.  Hefer further warned that "we expect that the positive effect" from the relevance assessment in "Q4 and Q1 will be partially mitigated in

2017." *Id.* at 4.[2]  And, at a subsequent presentation held on May 24, 2017, Hefer warned that "we see that advertisers are optimizing against the new algorithm" and, "[a]s a consequence, part of th[e] positive effect [from the relevance assessment] will, in the short term, come down."  Ex. 6 (May 24, 2017 Tr.) at 4.

In the earnings release for the next quarter, announced on August 4, 2017, trivago again disclosed that its increased revenue "included continued positive revenue effects from the introduction of our relevance assessment" because, "[a]s a reaction to the change, some advertisers compensated for their lower relevance assessments through higher cost-per-click bids."  Ex. 7 (Q2 2017 Press Release) at 2.  But the Company further stated that, "[i]n the final weeks of June 2017, cost-per-click bids normalized as most of our advertisers optimized their websites and bidding strategy in response to the introduction of the relevance assessment." *Id.* During the accompanying conference call, Hefer similarly stated that RPQR "continued to benefit from the relevance assessment," but further warned that "[w]e expect a deceleration of growth in the second half compared to very strong quarters in 2016" because, "[a]s anticipated, advertisers reacted to our relevance assessment at the end of the second quarter" and, "[a]s a result, the [RPQR] levels normalized."  Ex. 8 (Q2 2017 Conference Call) at 4.  And to avoid any doubt about the long-term impact of the relevance assessment, Hefer went on to state that the Company "expect[ed] the [RPQR] to basically go back to old levels" and "this positive effect that we had in Q1 and Q2 [will] go away for the full third and fourth quarter." *Id.* at 5.  Despite the continuing positive effect of the relevance assessment in the quarter, trivago announced a

---

[2]    During the call, Schrömgens also stated that the Company was "in the early stages" of the relevance assessment and some advertisers "are faster, some of them might be slower" responding, "[s]o it will again be a process over the next quarters and next years" to see the full impact of the change. *Id.* at 6.

decline in net income from the prior quarter, and the Company's stock price fell 18.6%.  CAC ¶ 91.

On September 6, 2017, before the date of its next quarterly earnings release, trivago announced that it was lowering its 2017 revenue growth guidance.  CAC ¶ 93.  In making that announcement, the Company attributed the decline to "[t]he anticipated negative impact" from the advertiser reaction to the relevance assessment being "more significant than previously expected."  Ex. 9 (Sept. 6, 2017 6-K) at 1.  At an investor conference, Hefer further explained that "the main impact that we have seen was the unwinding . . . of the impact on the [RPQR] of the relevance assessment."  Ex. 10 (Sept. 6, 2017 Tr.) at 1.  Hefer continued by explaining that the relevance assessment had "a positive impact on the first two quarters of [RPQR]," but:

> [At] end of June, as we mentioned in our earnings release beginning of August, weighted by revenue, the vast majority of our advertisers implemented our guidelines, so improved their score and reduced, as a consequence, their required bid for a certain traffic amount.  And we obviously anticipated that that would have a negative impact in particular on our performance marketing activities. Having said that, now looking at two month of performance afterwards, it had a bigger impact than we anticipated on the growth trajectory, both in our performance marketing traffic and in our branded traffic.

*Id.* at 1-2.  After the release of this guidance, trivago's stock price fell 16.3%.  CAC ¶ 97.

Finally, on October 25, 2017, trivago announced its third quarter 2017 results, which reported revenue that was 17% higher than the same quarter in the prior year but 3.5% lower than in the prior quarter.  *See* Ex. 11 (Q3 2017 Press Release) at 1; CAC ¶ 98.  The Company attributed these results to (among a number of other drivers) "a downward adjustment in cost-per-click bids and increased volatility after advertisers responded to the introduction of the relevance assessment."  Ex. 11 (Q3 2017 Press Release) at 6.  Following these announcements, trivago's share price fell 22.5%.  CAC ¶ 105.

8

**D. The Filing Of This Action And The CAC**

The action was initiated on October 30, 2017, and the CAC was filed on March 30, 2018. The pleading approach adopted in the CAC is to start with dates when trivago's share price fell purportedly due to disappointing financial results, and then leap to the conclusion that the Company's earlier disclosures were misleading (and even intentionally so) because those disclosures did not predict the subsequent financial results. In particular, the CAC brings claims under Section 11 of the Securities Act alleging that the Registration Statement was misleading because it failed to disclose that the relevance assessment—which the CAC does not even allege existed at the time—would be adopted and then lead to an increase in revenue during some quarters and a decrease during others. CAC ¶¶ 106-17. The CAC further alleges that trivago violated Section 11 by failing to disclose that one of its advertisers (Priceline) allegedly failed to follow the standards that trivago established for its advertisers' websites. CAC ¶ 106. Moreover, without making any factual allegations concerning scienter, the CAC also brings claims under Section 10(b) of the Exchange Act, asserting that the Company's disclosures were intentionally misleading because they did not accurately predict the specific timing or scope of the financial impact of the relevance assessment in future quarters. CAC ¶¶ 123-57. In other words, the CAC is a textbook example of impermissible fraud by hindsight, in which a "plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

## ARGUMENT

To survive a motion to dismiss, a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, a complaint must contain "factual content that allows the court to draw the

9

reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Plaintiffs have

not met these standards, and the CAC therefore fails to state a claim.[3]

**I.       The CAC's Securities Act Claims Fail Because Plaintiff Does Not Allege Any Actionable Misrepresentations Or Duty To Disclose At The Time Of The IPO**

To state a claim under Section 11 of the Securities Act, the CAC must adequately plead

that the Registration Statement "contained an untrue statement of a material fact or omitted to

state a material fact required to be stated therein or necessary to make the statements therein not

misleading" at the time of the IPO.  15 U.S.C. § 77k(a).  The CAC fails to do so for several

reasons, and its Section 11 claims must therefore be dismissed.

**A.   The CAC's Vague Allegations About The Timing Of The Relevance Assessment Fail To Plead It Existed And Could Be Disclosed In The Registration Statement**

Under the plain text of Section 11, plaintiffs can only state a claim if they plead that a

part of a registration statement contained a misstatement or omission "when such part became

effective."  15 U.S.C. 77k(a).  Therefore, as this Court recently recognized, "[w]hen pleading an

actionable omission, plaintiffs must, at a minimum, plead facts to demonstrate that allegedly

omitted facts both existed, and were known or knowable, at the time of the offering." *Singh v.*

*Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) (Buchwald, J.).

Here, the CAC fails to adequately plead that the Registration Statement contained any

omissions about the relevance assessment because Plaintiff does not allege that the relevance

assessment actually existed at the time of the offering.  Instead, the best the CAC can do is

vaguely allege that the relevance assessment was implemented:

- "At The Time Of (Or Shortly After) The IPO," CAC at 15;

---

[3]      Hefer and Schrömgens are also named as defendants, but have not been served.  Nonetheless, if the Court grants this motion on a ground that applies equally to these defendants, it can also dismiss the claims against them. *See Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011).

- "near the time of the IPO," CAC ¶ 3;

- "around the time of the IPO," CAC ¶ 61;

- "at or around the time of the IPO," CAC ¶ 12; or

- at "some (unspecified) point in December 2016." CAC ¶ 60.[4]

These vague allegations, which are equally compatible with the relevance assessment not existing at the time of the IPO, do not contain enough facts to "nudge[]" Plaintiff's claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 678. As such, the CAC's Section 11 claims about the relevance assessment must be dismissed. *See Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014) (dismissing Section 11 claim about problem that "continued to rise after the IPO" because "the accuracy of offering documents must be assessed in light of the information available at the time they were published").

### B. The CAC's Assertion That The Registration Statement Should Have Predicted The Precise Impact Of The Relevance Assessment In Subsequent Quarters Is Impermissible Fraud By Hindsight

The CAC's related contentions that the Registration Statement was misleading because it omitted "the expected impact (and duration of the impact)" of the relevance assessment, including that "the relevance assessment would provide a temporary increase to" RPQR "but then eventually crash trivago's revenue," CAC ¶¶ 65, 106, 109, similarly fail because the CAC does not establish either a duty to disclose that future impact or that the future impact of the relevance assessment was "known or knowable, at the time of the offering." *Singh*, 106 F. Supp. 3d at 446. To the contrary, the only factual allegations cited in support of this claim are the changes in revenue that happened during later quarters, without any non-conclusory attempt to

---

4    *See also* CAC ¶ 67 (trivago "implemented (or was imminently about to implement)" the relevance assessment "leading up to the IPO"); ¶ 112 (trivago "was in the process of changing (or had changed)" its policy at the time of the IPO); ¶ 114 (the relevance assessment was "impending" at the time of the IPO); ¶ 116 (trivago concealed "the implementation (or impending implementation) of the relevance assessment" in the IPO).

show these changes (including an initial increase and subsequent decrease) were even anticipated to occur as of the date of the IPO. But, it is well settled that such an attempt to "proceed with allegations of 'fraud by hindsight'"—meaning "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did"—"do not suffice to make out a claim." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).[5] Stated simply, the securities laws do not require companies to predict with certainty all of the ups and downs they will experience in the future.

A multitude of decisions, including many by this Court, have rejected similar allegations that a statement was misleading because it failed to predict a negative event that occurred later. For example, in *Singh*, plaintiffs alleged that defendants violated Section 11 by "fail[ing] to disclose that . . . [a] clinical study was flawed due to its relaxed enrollment criteria," and supported this allegation by pointing to the study's subsequent failure. 106 F. Supp. 3d at 446. Likening these allegations to prior decisions involving "classic fraud by hindsight," this Court dismissed plaintiffs' claims by stating: "[i]n the absence of data establishing that [the study] would not meet its endpoints" at the time of the offering "defendants were not required to predict negative results or to hypothesize its failure." *Id.* at 449.[6]

---

[5]  *See also In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) ("Plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claims cannot be based on a 'backward-looking assessment' of the registration statement.").

[6]  *See also In re ForceField Energy Inc. Sec. Litig.*, No. 15 Civ. 3020 (NRB), 2017 WL 1319802, at *14 (S.D.N.Y. Mar. 29, 2017) (Buchwald, J.) (statements "suggest[ing] that Forcefield no longer intended to do business in Mexico by mid-2015" did "not suggest that ForceField had formed that intent in late 2014" because "[a] finding to the contrary would invite impermissible fraud-by-hindsight"); *In re Open Joint Stock Co. Vimpel-Commc'ns*, No. 04 Civ. 9742 (NRB), 2006 WL 647981, at *6 (S.D.N.Y. Mar. 14, 2006) (Buchwald, J.) (allegations that did "not suggest how VimpelCom could have known that it would owe 'back taxes'" in the future were "a quintessential case of impermissibly pleading 'fraud by hindsight'"); *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25, 2003) (Buchwald, J.) (rejecting argument that "because sales were down at the end of the first quarter, the impending final results for the second quarter must have been apparent throughout the quarter" as "the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain").

Similarly, here, "[i]n the absence of any non-conclusory allegations that defendants foresaw the losses the [relevance assessment] would generate, plaintiff's *ex post facto* contention that" the future financial impact of the relevance assessment should have been disclosed in the Registration Statement "amounts to nothing more than an assertion of fraud by hindsight." *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 793 (S.D.N.Y. 2013) (Buchwald, J.). As such, the CAC's claim that the Registration Statement violated Section 11 by failing to disclose the future impact of the relevance assessment must be dismissed.

### C. The Statements In The Registration Statement That The CAC Alleges Should Have Disclosed The Relevance Assessment Were Either True Or Non-Actionable Forward-Looking Statements

Even if the CAC adequately alleged that the relevance assessment existed at the time of Registration Statement and that its future financial impact was foreseeable with certainty at the time of the IPO—which it does not—the CAC's Section 11 claims would still fail because it does not plead that the Registration Statement "contained an untrue statement of a material fact" or omitted a fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Instead, each of the three statements that the CAC challenges because they did not disclose the relevance assessment are either undeniably true or non-actionable.

*First*, the Registration Statement truthfully disclosed that "[p]ricing is determined through a competitive bidding process whereby advertisers bid on their placement priority for a specific hotel offer." CAC ¶ 111. That statement is not rendered false or misleading "because the Company omitted the fact that it was in the process of changing (or had changed) its price determination policy." CAC ¶ 112. The Registration Statement disclosed that trivago was "continually. . . refin[ing its] search algorithms." Ex. 1 (Prospectus) at 1. It also continued to be true, as the CAC itself concedes, that "advertisers bid on their placement priority" even after the relevance assessment. *See, e.g.*, CAC ¶ 64 (alleging the relevance assessment potentially

13

"penalize[d] advertisers' placement or prominence in trivago search results," but acknowledging "the penalty can be negated by bidding (and paying) more per click").

*Second*, trivago's description of the website's "hotel-level" bidding mechanics (as "giv[ing] our advertisers the flexibility to optimize their bidding strategy") and its identification of certain factors that influenced "bidding behavior" were not rendered untrue or misleading because of omission of the relevance assessment. CAC ¶¶ 113-14. Relevance assessment or not, trivago still utilized "hotel-level" bidding, advertisers still had "flexibility to optimize their bidding strategy," and the identified factors influenced their bidding behavior. Indeed, there is no allegation in the CAC that these factors were inconsistent with the relevance assessment.

*Third*, while the CAC acknowledges that trivago warned that "[w]e may not be able to maintain our historical growth rates in future periods," it nonetheless claims that this statement was "materially false and/or misleading because [it] failed to include . . . the implementation (or impending implementation) of the relevance assessment," which was allegedly "one of the single most important factors that would influence revenue growth in both the near and long term." CAC ¶¶ 115-16. But the challenged statement about the Company's future growth was plainly forward-looking and accompanied by meaningful cautionary language, including that revenue growth could slow due to "the emergence of alternative business models" and that the Company's "new business strategies and services . . . may not succeed." Ex. 1 (Prospectus) at 21, 28. That projection is therefore non-actionable under the bespeaks caution doctrine. *See Duane Reade*, 2003 WL 22801416, at *6.

14

**D. The CAC Fails To Allege An Actionable Omission In The Registration Statement Under Item 303 Regarding The Relevance Assessment Or Priceline**

Finally, the CAC's assertion that Item 303 of Regulation S-K required the Registration Statement to disclose the relevance assessment and Priceline's alleged violation of "the Company's landing page quality standards," CAC ¶¶ 107-10, also fails to state a claim.

Under Item 303, a company must "[d]escribe any known trends or uncertainties that have had or that registrant reasonably expects will have a material favorable or unfavorable impact on . . . revenues." 17 C.F.R. § 229.303(a)(3)(ii).  As this Court recently recognized, "Item 303 requires the registrant's actual knowledge of the relevant trend or uncertainty." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017) (Buchwald, J.).  Further, the "reasonably expects will have" standard requires "a quite substantial probability threshold both as to the occurrence of the event and the likelihood of a material resulting impact." *Id.*

Here, even more so than in *BHP*, there are no factual allegations demonstrating that trivago had "actual knowledge" of a "quite substantial probability" that the relevance assessment would have a "material resulting impact" on its revenue; indeed there are no factual allegations that the relevance assessment even existed at the time and, as such, no basis to include it could have any impact on trivago's future revenues.  *Id.* at 88-89 (dismissing Item 303 claim, even though complaint "plausibly allege[d] that BHP knew of serious risks with the Fundão dam," because it did "not go so far as to plausibly allege a risk 'known' to BHP that was both 'likely to come to fruition' and 'reasonably likely' to have 'a material effect on' BHP").  Similarly, as in *BHP*, "[i]t is, rather, quite implausible that [trivago] would neglect to address a *known* risk relating to the [relevance assessment] rising to the Item 303 level, especially since the [related] risk . . . was a type of risk that [trivago] had the capacity to control." *Id.*  Finally, with respect to Priceline, the CAC does not contain any well-pleaded facts demonstrating that trivago had

"actual knowledge" of Priceline's alleged violations of its landing page quality standards at the time of the IPO or a "quite substantial probability" that those alleged violations would have a "material resulting impact" on the Company in the future (when the allegedly violated policy was no longer in effect). *Id.* at 88-89. Again, the only facts the CAC advances to support such a conclusion are the Company's future increases and decreases in revenue, which are impermissible fraud by hindsight that fails to state a claim. *See supra* pp. 9, 11-13.

As a result, the CAC's Securities Act claims under Item 303 must be dismissed.

**II.     The CAC's Exchange Act Claims Must Be Dismissed Because Plaintiff Fails To Plead Scienter Or Any Actionable Misrepresentations**

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must adequately plead, among other things, that the defendants "(1) made misstatements or omissions of material fact; (2) with scienter." *Kelter v. Apex Equity Options Fund, L.P.*, No. 08 Civ. 2911 (NRB), 2009 WL 2599607, at *4 (S.D.N.Y. Aug. 24, 2009) (Buchwald, J.). In addition to satisfying the *Iqbal* pleading standards described above, a plaintiff alleging these claims must also satisfy the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Id.* at *3-4. Under these heightened standards, a plaintiff must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), "explain why the [challenged] statements were fraudulent," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007), and "state with particularity all facts" on which any allegations made on information and belief were formed. 15 U.S.C. § 78u-4(b)(1). Moreover, these heightened standards further require that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In order for an inference of scienter to qualify as "strong," it must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any

16

opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

U.S. 308, 314 (2007).

### A. The CAC Fails To Raise Any Inference Of Scienter, Let Alone Plead Particularized Facts Establishing A Strong Inference Of Scienter

For the purposes of Section 10(b) and Rule 10b-5, scienter requires "an intent to deceive,

manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  To

establish scienter, a plaintiff must allege specific facts "(1) showing that the defendants had both

motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of

conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  Here, the CAC is devoid of any

factual allegations that trivago acted with scienter.  Indeed, the CAC does not cite a single

undisclosed document contradicting the Company's statements or any witness who claims the

Company knew its statements were false when made.  The CAC does not use the word scienter a

single time.  As such, the CAC's Exchange Act claims must be dismissed.

#### 1. *The CAC Does Not Allege Any Motive Or Opportunity To Defraud*

"To raise a strong inference of scienter through the motive and opportunity prong, a

plaintiff must allege that the defendant benefitted in some concrete way from the purported

fraud," such as by engaging in suspicious stock sales before the truth is revealed.  *Foley v.*

*Transocean Ltd.*, 861 F. Supp. 2d 197, 209 (S.D.N.Y. 2012) (Buchwald, J.).  Here, no insider

stock sales are alleged and the only conceivable allegation concerning motive and opportunity is

the CAC's boilerplate assertion that trivago acted "for the purpose and effect of concealing

trivago's financial wellbeing and prospects from the investing public and supporting the

artificially inflated price of its securities." CAC ¶ 220.  However, this boilerplate motive, which

could be alleged with respect to all corporations at all times, fails to raise a strong inference of

scienter. *Foley*, 861 F. Supp. 2d at 209 ("Motives that are common to most corporate officers,

such as the desire for the corporation to appear profitable and the desire to keep stock prices

high . . . do not constitute 'motive' for purposes of this inquiry."). Accordingly, because the

CAC "fails to allege adequate motive, the strength of the circumstantial allegations of conscious

misbehavior or recklessness must be correspondingly greater." *Id.* at 209 n.12.

### 2. The CAC's Conclusory Allegations Of Conscious Misbehavior Or Recklessness Fail To Raise An Inference Of Scienter

"A plaintiff can make a showing of conscious misbehavior or recklessness through

evidence demonstrating that the defendants: (1) benefitted in a concrete and personal way from

the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to

information suggesting that their public statements were not accurate; or (4) failed to check

information they had a duty to monitor." *Id.* at 210.[7]  The CAC contains no such allegations and,

instead, relies on conclusory assertions that the Company acted "knowingly" or "recklessly."

*See* CAC ¶¶ 219-21. But such "naked assertions" of a legal conclusion "devoid of further factual

enhancement" are insufficient even under Rule 8, *Iqbal*, 556 U.S. at 678, let alone the heightened

pleading standards that apply here. *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan

Corp.*, 951 F. Supp. 2d 479, 502 (S.D.N.Y. 2013) (Buchwald, J.) (rejecting scienter allegations

based on "[v]ague reference to publicly-available" information).

The only other scienter allegations in the CAC are boilerplate assertions that the

Company's executives had access to information contradicting the Company's disclosures based

on their corporate positions. *See* CAC ¶¶ 31, 219.  However, "[s]cienter cannot be inferred

solely from the fact that, due to the defendants' board membership or executive managerial

---

[7]     For these purposes, recklessness is "conduct that is 'highly unreasonable' and [] represents an extreme
departure from the standards of ordinary care to the extent that the danger was either known to the defendant or
so obvious that the defendant must have been aware of it." *Id.*  Further, it must be "conscious recklessness—
i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." *Id.*

position, they had access to the company's internal documentation as well as any adverse information." *Foley*, 861 F. Supp. 2d at 212. To the contrary, "where a plaintiff's theory of scienter rests on the existence of adverse facts to which a defendant supposedly had access, the plaintiff must 'specifically identify the reports or statements containing this information.'" *Id.* The CAC makes no attempt to do so, and therefore fails to raise any inference of scienter.

Rather than citing any contemporaneous information demonstrating trivago knew (or was reckless in not knowing) about the future impact of the relevance assessment at the time of the challenged statements, the CAC instead assumes that the impact of the relevance assessment was "inevitable" and therefore contends (without further factual support) that the Company must have known of these precise consequences earlier. *See, e.g.*, CAC at 25. However, such reliance on "sources released long after the challenged . . . statements" constitutes nothing more than fraud by hindsight, which is insufficient to establish scienter. *Foley*, 861 F. Supp. 2d at 213-14 ("For obvious reasons, a showing of recklessness cannot be premised on information that was not reasonably available to the speaker at the time of the alleged misrepresentations.").[8]

Moreover, any inference of scienter raised by the CAC is further undercut by the Company's repeated warnings throughout the relevant period that the positive revenue impact from the relevance assessment would be temporary as advertisers adapted to the change. *See supra* pp. 5-8. These warnings about the precise risk that the CAC alleges came to pass defeat any claim that the Company acted with an intent to deceive. *See Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *20 (S.D.N.Y. Sept. 28,

---

[8]     *See also Magna*, 967 F. Supp. 2d at 793 ("[C]orporate officials need not be clairvoyant, and they are only responsible for revealing those material facts reasonably available to them").

2010) ("Defendants' disclosures about the risk . . . are inconsistent with a state of mind going toward [scienter].").

### 3. *Any Weak Inference Of Scienter Is Neither Cogent Nor Compelling*

Given that the CAC does not contain any particularized facts concerning scienter, it fails to raise any inference of scienter and must be dismissed. Nonetheless, to the extent the CAC can be seen as raising any weak inference of scienter, it is neither cogent nor compelling. Instead, the inference advanced in the CAC is absurd: that the Company (1) implemented the relevance assessment even though it knew that change would lead to "dismal" results and (2) freely disclosed the relevance assessment it knew would fail, all the while (3) its executives did not sell any stock and (4) repeatedly warned investors that the positive revenue effects of the relevance assessment would diminish over time before (5) voluntarily disclosing revised earnings guidance in the middle of a quarter. *See City of Monroe Emps. Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835 (NRB), 2011 WL 4357368, at *17 (S.D.N.Y. Sept. 19, 2011) (Buchwald, J.) (rejecting inference that defendants "concocted a fraudulent scheme" to sell an asset for less than it was worth "only to reveal this massive overvaluation to the world a few months later" as "simply bizarre" and "extremely illogical").

In contrast to the illogical inference of scienter advanced by the CAC, the opposing inference of nonfraudulent intent is far more likely: that the Company (1) adopted the relevance assessment because it thought doing so would improve its users' experience and therefore its profitability, (2) voluntary disclosed the relevance assessment and repeatedly warned investors that the increase in revenue from the relevance assessment could be temporary, and (3) remained optimistic about the relevance assessment's prospects until (4) being surprised by the size of its negative impact several quarters later and promptly disclosing that fact. As a result, the CAC fails to raise a strong inference of scienter, and its Exchange Act claims fail.

**B. The CAC Does Not Adequately Plead Any Misstatements Or Omissions In Support Of Its Exchange Act Claims**

Although the CAC's failure to raise a strong inference of scienter is an independently sufficient basis to dismiss its Exchange Act claims, those claims also fail because Plaintiff does not adequately plead that the Company made any actionable misstatements or omissions.

The CAC's overarching theory is that, while trivago made various disclosures about the relevance assessment and the Company's financial performance, those disclosures nonetheless were false or misleading because they failed to precisely predict the timing or size of the financial impact of the relevance assessment or to describe it in sufficiently gloomy terms. As before, this theory fails for the fundamental reason that the CAC relies on impermissible fraud by hindsight and pleads no facts demonstrating that the eventual impact of the relevance assessment was knowable at any earlier point in time. *See supra* pp. 10-13. Even setting this aside, however, the specific misrepresentations alleged in the CAC fail for many additional reasons.

1. *Statements Regarding The Fourth Quarter Of 2016*

The challenged statements regarding the fourth quarter of 2016 fail for several reasons.

*First*, the statements from the 2016 Form 20-F—concerning pricing, the bidding process, and risks to historical growth, CAC ¶¶ 132-37—are identical to ones discussed above and fail for the same reasons. *See supra* pp. 13-14. Moreover, the challenged statement concerning future revenue, as well as trivago's 2017 guidance, CAC ¶¶ 130-31, are also non-actionable under the PSLRA safe harbor for forward-looking statements because the CAC fails to prove they were made with actual knowledge they were false, and they were accompanied by cautionary language. *See* 15 U.S.C. § 78u-5(c)(1); *see also Duane Reade*, 2003 WL 22801416, at *6.

*Second*, the CAC's contention that the Company's accurate reporting of financial results was misleading because those results were not attributed to the relevance assessment or caveated

that the relevance assessment's positive impact could be "temporary," CAC ¶¶ 123-31, fails because "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016).[9]

*Third*, the CAC's argument that various statements by the Company on February 24, 2017 were misleading because they "failed to disclose" that growth was "driven, in part, by the introduction of the relevance assessment," CAC ¶¶ 123-31, ignores Hefer's explicit statement that there was an increase in revenue because the Company was "optimiz[ing its] algorithm." Ex. 2 (Q4 2016 Conference Call) at 6. This disclosure of the very issue that Plaintiff claims was omitted defeats his claim. *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) (dismissing securities claim where "[t]he allegedly omitted facts were either disclosed or implied in the offering memoranda"). Moreover, the CAC does not identify any duty to make further granular disclosures about the relevance assessment. *See Magna*, 967 F. Supp. 2d at 797 (finding no misstatement where defendants disclosed the relevant issues because the "federal securities laws simply do[] not require the pessimism or granular information that plaintiff's theory demands").

## 2. *Statements Regarding The First Quarter Of 2017*

The challenged statements concerning the first quarter of 2017 are also not adequately pleaded to be false or misleading. Instead, they are premised on mischaracterizations of the Company's accurate statements and additional attempts to plead fraud by hindsight.

*First*, the CAC's challenge to the Company's statement that it had a "strong start" in 2017 because of a "focus on improving our hotel search product and market leading

---

[9]   *See also Duane Reade*, 2003 WL 22801416, at *6 ("[D]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future").

innovation"—on the ground that "strong start" was actually "driven by the implementation of the relevance assessment," CAC ¶¶ 138-39—is nonsensical.  The relevance assessment was an improvement to the Company's "hotel search product" and an "innovation."  In any event, the same press release specifically attributed the Company's increased revenue to "the introduction of a relevance assessment," Ex. 4 (Q1 2017 Press Release) at 3, which defeats Plaintiff's claim.  *See Halperin*, 295 F.3d at 361.

*Second*, the CAC's claims that trivago misled investors by stating its growth was "largely driven" by the relevance assessment (which was supposedly responsible for the "entirety" of that growth) and that advertisers paid more "[i]n some cases" after the change (which allegedly obscured that it "impact[ed] Priceline," which was responsible for "nearly half" of trivago's revenue), CAC ¶¶ 140-41, is frivolous.  Those statements were true, and the securities laws do not require companies to accompany their disclosures with the particular pejoratives requested by plaintiffs.  *See In re MGT Capital Invs., Inc. Sec. Litig.*, No. 16 Civ. 7415 (NRB), 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) (Buchwald, J.).  Moreover, the CAC fails to explain why these slight differences in characterization—"largely" instead of "entirely" and "in some cases" rather than "in nearly half of cases"—would be material to an investor.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).  And, the CAC fails to allege facts demonstrating that no other factor contributed to the Company's growth.

*Third*, the allegation that the Company's accurate disclosure of its net income was rendered misleading because it did not identify the portion that was connected to the relevance assessment, CAC ¶¶ 142-43, fails because "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."  *In re Sanofi*, 155 F. Supp. 3d

at 404.  Moreover, the CAC does not identify "any specific standard, regulatory or otherwise,"
requiring the disclosure of this "granular information."  *Magna*, 967 F. Supp. 2d at 797.

*Fourth*, the assertion that the Company misled investors during the conference call by
indicating that advertisers who did not meet the Company's standards were previously excluded
from the marketplace (because Priceline allegedly was not in compliance), CAC ¶¶ 144-45,
relies on a selective quotation.  In the very next paragraph of the call transcript, the Company
made clear that "advertisers were even finding ways around our specifications."  Ex. 5 (Q1 2017
Conference Call) at 3.  Plaintiff cannot allege a misstatement by "cherry-pick[ing]" disclosures.
*Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 41 (S.D.N.Y. 2016).[10]

*Fifth*, it is unclear why Plaintiff believes the Company's statement that it "expect[ed] the
positive effect that we saw in Q4 and Q1" from the relevance assessment "will be partially
mitigated in 2017," CAC ¶¶ 146-47, was misleading.  That statement disclosed the very
information that the CAC alleges the Company omitted.  To the extent Plaintiff claims the
guidance was false because it did not accurately predict the future extent of the "mitigat[ion],"
that contention fails because the law did not require trivago to disclose the precise extent of
mitigation (particularly when it was not known to trivago) and because the statement is protected
by both the PSLRA safe-harbor for forward-looking statements and the bespeaks caution
doctrine.  *See supra* pp. 14, 21-22.  Moreover, this Court has previously rejected a nearly
identical argument.  *See Hartford*, 2011 WL 4357368, at *19 (rejecting argument that "beyond
simply disclosing negative information, defendants must also quantify the precise impact the

---

[10]    Similarly, the CAC misrepresents the transcript when it alleges that the Company said the relevance
assessment was "introduced to create 'flexibility.'"  CAC ¶ 145.  Instead, the transcript says "flexibility"—
which the relevance assessment unquestionably provided, *see supra* p. 14—was an "advantage[] for the
advertiser."  Ex. 5 (Q1 2017 Conference Call) at 3.  Plaintiff cannot state a claim by misrepresenting the
Company's disclosures.  *See DeMaria v. Andersen*, 153 F. Supp. 2d 300, 306 (S.D.N.Y. 2001), *aff'd*, 318 F.3d
170 (2d Cir. 2003).

information will have on future financial results," including because, "we cannot conclude that such an omission would be material").

       3.   *Statements Regarding The Second Quarter Of 2017 And Subsequent Guidance Downgrade*

The alleged misstatements and omissions regarding the second quarter of 2017 and the subsequent guidance downgrade fail for many of the same reasons:

- The CAC's challenges to trivago's guidance, CAC ¶¶ 148-49, 154-55, fail because those projections are protected by the PSLRA safe harbor and the bespeaks caution doctrine, and Plaintiff does not identify any duty to separately report the impact of the relevance assessment. *See supra* pp. 14, 21-22.

- The allegation that the Company misled investors by describing the relevance assessment as "one of the drivers" of growth rather than the "entire[]" driver, CAC ¶¶ 150-51, fails because the CAC does not allege that no other factor contributed to growth, the Company was not required to characterize the relevance assessment in any particular way, and the CAC does not explain why the alleged difference would be material to an investor. *See supra* p. 23.

- The CAC's contention that trivago's accurate reporting of net income was misleading because it did not provide the specific impact attributable to the relevance assessment, CAC ¶¶ 153-54, fails because Plaintiff cannot base a claim of securities fraud on the disclosure of accurate historical data, and the CAC does not identify any duty to disclose further granular information about the specific impact of the relevance assessment. *See supra* p. 22.

*Finally*, the allegation that the Company misled investors on September 6, 2017 by stating that "[t]he anticipated negative impact on RPQR . . . [was] more significant than previously expected" (because "Defendants were aware of the substantial impact that the relevance assessment was having on the Company's RPQR growth during Q1 and Q2 2017"), CAC ¶¶ 156-57, simply does nothing to establish that the challenged statement was false.  Those allegations do not identify the Company's previous expectations concerning the negative impact or provide any particularized factual allegations establishing that the actual impact was anything other than more significant than expected.  Instead, this allegation—like many others in the CAC—is nothing more than impermissible fraud by hindsight.

## **CONCLUSION**

For the foregoing reasons, the CAC should be dismissed with prejudice in its entirety

under Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), and the PSLRA.

Dated: New York, New York
      May 14, 2018

                Respectfully submitted,

                CLEARY GOTTLIEB STEEN & HAMILTON LLP

                By:

                    Lewis J. Liman
                    Jared Gerber
                    One Liberty Plaza
                    New York, New York 10006
                    Telephone: (212) 225-2000
                    Facsimile: (212) 225-3999

                    *Counsel for Defendant trivago N.V.*