UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ANTHONY HOLBROOK, Individually and On
Behalf of All Others Similarly
Situated,

        Plaintiff,

    - against -

TRIVAGO N.V., ROLF SCHRÖMGENS, AXEL
HEFER, NATIONAL CORPORATE RESEARCH,
LTD., J.P. MORGAN SECURITIES, LLC,
GOLDMAN, SACHS & CO., MORGAN STANLEY
& CO. LLC, ALLEN & COMPANY LLC,
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED, CITIGROUP GLOBAL
MARKETS INC., DEUTSCHE BANK
SECURITIES INC., COWEN AND COMPANY,
LLC, and GUGGENHEIM SECURITIES, LLC,

        Defendants.
------------------------------------X

**MEMORANDUM AND ORDER**

17 Civ. 8348 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Lead Plaintiff Dharmanand Shetty brings this federal securities class action on behalf of all individuals and entities that purchased or otherwise acquired american depositary shares ("ADSs") of trivago, N.V. ("Trivago" or "the Company") (1) between December 16, 2016 and October 25, 2017, inclusive (the "Class Period"), or (2) pursuant or traceable to the registration statement issued in connection with the Company's initial public offering on or about December 16, 2016. Plaintiffs allege violations of Section 11 of the Securities Act of 1933 ("Securities Act") against Trivago, its chief executive officer ("CEO") Rolf

1

Schrömgens, and its chief financial officer ("CFO") Axel Hefer (collectively, "the Trivago Defendants"), the Company's underwriters J.P. Morgan Securities, LLC, Goldman, Sachs & Co., Morgan Stanley & Co. LLC, Allen & Company LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Cowen and Company, LLC, and Guggenheim Securities, LLC (collectively, "the Underwriter Defendants"), and the Company's U.S. representative National Corporate Research, LTD ("NCR"). Plaintiffs further allege violations of Section 10 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against the Trivago Defendants and bring "control person" claims against Schrömgens and Hefer (together, the "Individual Defendants") under both Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

Presently before the Court are: (1) Trivago's[1] motion to dismiss the Consolidated Amended Class Action Complaint ("CAC") in its entirety for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"); (2) the Underwriter Defendants' motion to dismiss plaintiffs' Section 11 claims as against the Underwriter Defendants pursuant to Rule 12(b)(6); and (3) NCR's motion to dismiss plaintiffs' Section 11

---

[1] To date, neither of the Individual Defendants have been served, and Trivago therefore moves only on the Company's behalf.

claims as against NCR pursuant to Rule 12(b)(6) and for insufficient service of process pursuant to Rule 12(b)(5). For the reasons that follow, NCR's motion to dismiss pursuant to Rule 12(b)(5) is denied and all moving defendants' motions to dismiss for failure to state a claim are granted.

## FACTUAL BACKGROUND[2]

A. **Trivago Defendants**

Trivago operates a global hotel search platform that allows users of the Company's website or mobile application to search for and compare deals from a variety of hoteliers and online travel agencies ("OTAs"). Trivago offered access to approximately 1.3 million hotels in over 190 countries as of December 31, 2016. CAC ¶ 43; Gerber Decl. Ex. 1 at 1. At all times relevant to this action, defendant Rolf Schrömgens has served as Trivago's CEO and defendant Axel Hefer has served as the CFO. Both Schrömgens and Hefer were also managing directors of Trivago.

B. **Trivago's Business Model**

---

[2]     The following allegations are largely drawn from the CAC [ECF No. 26], and are assumed to be true for purposes of these motions. See Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006). We also consider any "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [Securities and Exchange Commission ("SEC")], and documents possessed by or known to the plaintiffs and upon which they relied" in bringing this action, ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007), which include the eleven documents attached as exhibits to the Declaration of Jared Gerber ("Gerber Decl."), May 15, 2018, ECF No. 43.

3

The Company generates substantially all of its revenue by charging its advertisers – the aforementioned hoteliers and OTAs - a fee in exchange for listing their offers on Trivago's search platform. CAC ¶ 46. The fee is assessed on a "cost-per-click" basis, whereby an advertiser pays Trivago each time that a user clicks on that advertiser's offer and is transferred to the advertiser's website or "landing page." Id. The size of the fee is determined by a bidding process through which advertisers compete for prominence within Trivago's search results; the higher an advertiser bids to pay per click, the more likely it is that Trivago will display their offer towards the top of its users' search results.[3] Id. ¶ 47.

C. **Introduction of the Relevant Assessment**

Trivago has an obvious financial interest in the quality of its users' experiences after they click on a hotel offer and are transferred to an advertiser's landing page for booking. The more positive the post-click experience, the more likely it is that a user will book a hotel, and, consequently, the more advertisers will be willing to bid for a prominent listing on Trivago's platform. Id. ¶ 59. Conversely, if an advertiser's landing page requires users to take cumbersome and unnecessary steps before

---

[3]     An advertiser's bid amount is not the only factor influencing where an advertiser's offer will appear on Trivago's search platform. The Company's proprietary search ranking algorithm also considers, for example, the offered room rate and the likelihood that the offer will match the user's specific hotel search criteria. CAC ¶ 47.

finalizing their booking, or bombards users with unsolicited advertisements for additional services, users will be less likely to book a hotel through that advertiser, which will ultimately depress the value of a click on Trivago's website and negatively impact its advertisers' bid amounts.

Up and until an unspecified date in December of 2016, the Company had a policy under which an advertiser could be excluded from Trivago's website "unless its landing page was up to Trivago's user experience standards." Id. ¶ 9. While, in theory, this policy was intended to prohibit non-compliant advertisers from appearing on Trivago's search platform, in practice larger advertisers like Priceline[4] found a way around the policy, as described by Schrömgens during a conference call announcing quarterly financial results in May of 2017:

> For many years . . . we defined pretty clearly what kind of landing pages we expect from the advertisers. And an advertiser who did not want or could not comply with our expectation was not allowed to participate in the marketplace. This came with several problems. On one hand advertisers were not able to join the auction if they were not changing the landing pages. On the other side, existing advertisers did not really have the chance to test the landing experience and find a better solution. Sometimes advertisers were even finding ways around our specifications and they created inefficiencies in the marketplace and inferior overall user value.

---

[4] Priceline and Expedia were responsible for generating nearly 80% of Trivago's revenue in 2016 and 2017, with Priceline and its affiliated brands alone responsible for nearly 45% both years. Id. ¶ 49. Expedia has held a controlling stake in Trivago since 2013, making Priceline Trivago's largest non-affiliated advertiser by a considerable margin. Id. ¶ 45.

Id. ¶ 82.  Hefer similarly described the pre-December 2016 policy

at an industry conference in November of 2017:

> The shortcoming of [the pre-December 2016] system was
> that the only stick, in a way, that we had was not to
> allow somebody on the platform.  You know, so if somebody
> would just give us different landing pages and with a
> different user experience, we could only say, 'Okay.
> Fine.  We don't accept you anymore. You have to stay off
> the platform.'  And so end of [2016] some of our larger
> advertisers realized that that is not a particularly
> credible threat for a sizable advertiser and started to
> test around with different designs which I can fully
> understand from their perspective, but from our
> perspective, that is a not as good user experience.  And
> once you allow larger advertisers to deviate from your
> rules, in a way, you give them an additional advantage
> in the marketplace.

Id. ¶ 178.

At some point in December of 2016, Trivago introduced a new

policy called the "relevance assessment" to address the

enforcement problems inherent in the Company's pre-December 2016

approach to regulating advertiser landing pages.  The relevance

assessment is fairly characterized as a carrot to the prior

policy's stick, in that it created a financial incentive for

advertisers to adhere to Trivago's landing page standards instead

of threatening outright exclusion from the platform for failing to

do so.  At the same November 2017 conference, Hefer explained the

new policy in the following way:

> [T]he relevance assessment that we introduced end of
> [2016] was basically a set of criteria, what we think is
> a good experience and is a bad experience, and based on
> these criteria you would basically get a score. That
> then works very similar to quality scoring other

6

searches, which is basically a modifier of the bids. As a consequence, those advertisers that deviated significantly from what we think is ideal had to pay in a way a penalty or had to pay more to get the same.

Id. In other words, an advertiser that failed to comply with Trivago's landing page standards was given a low score that factored into Trivago's search ranking algorithm and decreased the relative prominence of that advertiser's hotel offers in Trivago's search results. Non-compliant advertisers could then determine whether to offset the negative impact of their low scores by paying a "penalty" in the form of a higher bid per click amount. Id. ¶¶ 61–64.

D. **Impact of the Relevance Assessment**

Plaintiffs allege that the introduction of the relevance assessment "had a temporary and substantial positive impact on Trivago for a portion of the Class Period (especially the first half of 2017)," as advertisers with low relevance assessment scores like Priceline paid penalties in the form of increased bids in order to maintain prominence in Trivago's search results. CAC ¶ 15. This led to an increase in Trivago's revenue and RPQR[5] in the first quarter of 2017 ("Q1 2017") and second quarter of 2017 ("Q2

_____

[5] "Qualified referrals" or "QRs" measure the number of unique visitors that click through from Trivago's platform to an advertiser's website per day, CAC ¶ 52, while "revenue per qualified referral" or "RPQR" refers to the revenue generated per QR, and describes "the quality of [Trivago's] referrals, the efficiency of [Trivago's] marketplace, and as a consequence, how effectively [Trivago] monetize[s its] users." Id. ¶ 53.

2017"), as well as (to a lesser extent) the fourth quarter of 2016 ("Q4 2016"). Id.

By the end of Q2 2017, advertisers began to conform their landing pages to Trivago's standards and "no longer had to pay the 'poor relevance assessment score penalty' to obtain the same priority in search results." Id. ¶ 16. The temporary boost to Trivago's revenues therefore disappeared, and plaintiffs allege that the policy ultimately had a deleterious effect on Trivago's broader relationship with Priceline.

E. **Class Period Events and Disclosures**

According to plaintiffs, the Company failed to timely disclose the existence of the relevance assessment, downplayed the new policy's impact on revenue throughout the Class Period, and "omitted that it was expected to be a short-term boost that would instantly end once Priceline complied with Trivago's new guidelines." Id. ¶ 15. We summarize the Class Period events and disclosures relevant to plaintiffs' allegations below.

i. <u>Initial Public Offering</u>

The Class Period begins on December 16, 2016, around the time that Trivago introduced the relevance assessment and on the date of the Company's initial public offering ("IPO" or "the Offering"). In connection with the IPO, Trivago filed a Form F-1 with the SEC on November 14, 2016, an amended Form F-1 on December 5, 2016, a Form F-6 on December 6, 2016, and a prospectus on December 16,

2016 (collectively, the "Registration Statement").[6] Id. ¶¶ 54–57. Trivago's Registration Statement described the nature of Trivago's business and various risks attendant to an investment therein, without referencing the implementation (or impending implementation) of the relevance assessment or the fact that Priceline or any other advertiser had been violating Trivago's landing page standards leading up to the Offering.

With respect to the bidding process, the Registration Statement explained to potential investors that the price that advertisers pay per click "is determined through a competitive bidding process whereby advertisers bid on their placement priority for a specific hotel offer." Id. ¶ 111. According to Trivago, advertisers' bidding behavior was influenced by:

> the rate at which our referrals result in bookings on the advertisers' sites, or booking conversion, and the amount our advertisers obtain from referrals as a result of hotels booked on their sites, or booking value, and the degree to which advertisers are willing to share the overall booking value, or revenue share.

Id. ¶¶ 113–14. Trivago also disclosed the introduction (in early 2015) of "hotel-level CPC bidding," which allowed advertisers the freedom to bid any amount rather than choosing from a pre-determined selection of possible bid amounts. Id. ¶ 113.

---

[6] Schrömgens and Hefer signed the Form F-1, amended Form F-1, and Form F-6 in their respective capacities as Managing Directors of Trivago. Defendant NCR signed the Form F-6 in its capacity as Trivago's "authorized representative in the United States." Id. ¶¶ 54–56.

The Registration Statement further disclosed Trivago's historical revenue figures and warned that the Company "may not be able to maintain [its] historical growth rates in future periods," and that "[r]evenue growth may slow or revenues may decline for any number of reasons," Gerber Decl. Ex. 1 at 21, including, e.g., the "emergence of alternative business models."[7] CAC ¶ 115.

In the Offering, the Company sold 20,826,606 ADSs at $11.00 per share, receiving aggregate net proceeds of €207.8 million after deducting underwriting discounts and commissions.[8] Additionally, certain insiders (including Schrömgens) sold a total of 9,200,029 ADSs for gross proceeds of more than $101 million.[9] Id. ¶ 58.

### ii. Q4 2016 Financial Results

On February 24, 2017, Trivago issued its fourth quarter 2016 press release ("Q4 2016 PR") announcing positive financial results for the fourth quarter of 2016. Revenue grew 70% year-over-year,[10] net income rose from -€0.2 million to €0.1 million, and RPQR increased from €1.32 to €1.36. Id. ¶ 71. Trivago informed

---

[7]     Trivago made substantially the same representations in its 2016 annual report filed on Form 20-F with the SEC on March 9, 2017. CAC ¶¶ 132, 134, 136; see Pls.' Opp. to Trivago Br. at 12, June 28, 2018, ECF No. 51.

[8]     The Underwriter Defendants served as Trivago's underwriters for purposes of the Offering. Id. ¶ 199.

[9]     Denominations of currency appear as pleaded in the CAC.

[10]     "Year-over-year" indicates a comparison between the same fiscal quarters in consecutive years (e.g., Q4 2015 and Q4 2016). Unless otherwise noted, referenced comparisons are year-over-year.

shareholders that the growth in revenue "was driven by the opportunity to invest in advertising above fourth quarter 2015 levels," id. ¶ 124, and "improved commercialization," id. ¶ 125.[11]

In his introductory remarks on the Q4 2016 conference call ("Q4 2016 CC") held that same day, Hefer explained that the "improved commercialization" in Q4 2016 was due to changes made to Trivago's marketplace algorithm (which the parties now agree was a reference to the introduction of the relevance assessment): "In terms of revenue per qualified referral . . . we see, and particularly in the Americas is that there is [] an improved commercialization, which leads to an increase in the revenue per QR. This happens frequently because we continuously optimize our marketplace algorithm and then try out new things." Id. ¶¶ 127–28. Hefer warned, however, that:

> [h]aving said that [] it takes some time to see whether actually these effects are temporary or not. So we take it with a grain of salt and do not re-adjust our view on the business, and would like to see that improved commercialization for at least a second quarter, if not a third quarter before we will change our view. And very difficult [*sic*] to see -- to forecast whether these changes are temporary or lasting.

Gerber Decl. Ex. 2, ECF 43-2 at 6.

---

[11] "Commercialization" refers to the percentage of advertisers' profits generated from Trivago referrals that advertisers are willing to share with Trivago. By way of example, if advertisers are willing to bid more per click to achieve the same revenue stream, that would lead to an increase in Trivago's commercialization. CAC ¶ 67 n.12.

After opening the call up for questions, an analyst asked Hefer to expand upon "the commercialization issue," to which Hefer responded:

> So as I said, I mean, we continuously are optimizing our marketplace algorithms, and there are many small things that we continuously do. So it is a bit difficult to give you the technical detail and some of these tests are -- show a little of effect in the short-term and then normalize over time as there is just an initial reaction of the advertisers, and then they get used to it in a way and the bidding is normalizing.

Id. at 7.

Hefer also provided prospective guidance for the fiscal year 2017 on the call, predicting "revenue growth of the financial year 2017 versus 2016 to be 45% or higher." CAC ¶ 130. Hefer continued:

> I would like to make two comments on the seasonality pattern, given that we only give annual guidance. So the revenue distribution in the four quarters we expect in 2017 to be similar than 2016, with a slightly higher share of the first quarter and the second quarter compared to 2016.

Id.

### iii. Increased Revenue Growth Guidance and First Quarter 2017 Financial Results

On April 27, 2017, Trivago issued a press release (prior to announcing its first quarter 2017 financial results) in which the Company increased its expected annual revenue growth projection to 50%:

> "With a strong focus on improving our hotel search product and market leading innovation, we look forward to reporting our financial results on May 15, 2017. Given our strong start to the year, we

have increased our full-year guidance and now expect
annual revenue growth to be around 50% in 2017, with
our adjusted EBITDA* margin likely to be up slightly
from 2016."

Id. ¶ 138.

Weeks later, on May 15, Trivago issued its Q1 2017 press
release ("Q1 2017 PR"), in which it announced another quarter of
positive financial results, with net income increasing by €7.
million and RPQR growing by 4%. Id. ¶ 76. The press release
explicitly attributed the increase in revenue to the introduction
of the relevance assessment in its marketplace algorithm: "This
growth was largely driven by the introduction of the relevance
assessment in our marketplace algorithm in December 2016, which
assesses the quality of the users' experience after leaving our
website. In some cases, advertisers have compensated for their
lower relevance assessments through higher cost-per-click bids."
Id. ¶ 140. Consistent with the cautionary language the Company
used in announcing its Q4 2016 results, Trivago made clear that
"[w]e expect that, as advertisers optimize their websites and
bidding strategy, these positive revenue effects will be partially
mitigated over time." Gerber Decl. Ex. 4 at 3.

Schrömgens and Hefer hosted the Company's Q1 2017 conference
call ("Q1 2017 CC") that same day. Schrömgens provided broad
background on the relevance assessment and the impetus for its
adoption:

For many years our solution to secure [end-to-end user value creation] was rather simple, so we defined pretty clearly what kind of landing pages we expect from the advertisers. And an advertiser who did not want or could not comply with our expectation was not allowed to participate in the marketplace. This came with several problems.

On one hand advertisers were not able to join the auction if they were not changing the landing pages. On the other side, existing advertisers did not really have the chance to test the landing experience and find a better solution. Sometimes advertisers were even finding ways around our specifications and they created inefficiencies in the marketplace and inferior overall user value.

With the new dynamic relevance assessment of the booking funnel, we give advertisers the flexibility to adapt their landing pages, but at the same time the relevance factor becomes a variable in their optimization. So with this actually we became pretty agnostic of how booking funnels would look like, but we still secure the maximum overall user value on Trivago. We really believe that this is a natural extension of the free marketplace, allowing each individual advertiser to optimize but making the overall value creation of guiding principle.

So to sum up, the advantage for the user among others is to get a really optimized experience throughout the booking process and across the advertisers. The advantages for the advertisers are an easy access to the platform and more flexibility in optimization.

Gerber Decl. Ex. 5 at 3.

Asked about how advertisers were adapting their landing pages

to Trivago's new policy, Schrömgens responded:

This is still in a very early stage. It's a quite complex thing so it's not very easy. So we are currently in the early stages of this.

...

14

> Still this will be of course a development over time.
> It involves not only us but it involves also all of
> our advertisers; some of them are faster, some of
> them might be slower with their adoptions.

Id. at 6.

Hefer also reaffirmed Trivago's earlier annual revenue growth guidance for 2017: "We expect that the positive effect that we saw in Q4 and Q1 will be partially mitigated in 2017. As a consequence, we expect the revenues for the overall year to grow around 50%." CAC ¶ 146.

Nine days later, on May 24, 2017, Hefer participated in the J.P. Morgan Global Technology, Media and Telecom Conference and further described the rationale behind the implementation of the relevance assessment, reiterating Trivago's expectation that advertisers would conform their landing pages and, "[a]s a consequence, part of th[e] positive effect [from the relevance assessment] will, in the short term, come down." Gerber Decl. Ex. 6 at 4.

Plaintiffs allege that Trivago's supposed failure to fully disclose the impact of the relevance assessment on its growth rates in Q1 2017 "helped drive the Company's share price up to a Class Period high of $24.07 per share on July 19, 2017." CAC ¶ 83.

iv. Second Quarter 2017 Financial Results

On July 27, 2017, Trivago once again reaffirmed its projection of 50% revenue growth for the fiscal year 2017. Id. ¶ 148. One

week later, on August 4, Trivago issued its second quarter 2017 press release ("Q2 2017 PR"), announcing a third consecutive quarter of year-over-year RPQR growth, which "continued to be positively impacted by the introduction of the relevance assessment in our marketplace algorithm, which was one of the drivers of the 4% and 5% growth in RPQR during the quarter and six months ended June 30, 2017, respectively, as compared to the same periods in 2016." Id. ¶ 150. Trivago informed investors, however, that the short-term boost in revenue attributable to the implementation of the relevance assessment was coming to an end: "[I]n the final weeks of June 2017, cost-per-click bids normalized as most of our advertisers optimized their websites and bidding strategy in response to the introduction of the relevance assessment." Id. ¶ 161.

On the same day, Trivago held its Q2 2017 conference call ("Q2 2017 CC"), on which Hefer further stated:

> We expect a deceleration of growth in the second half compared to very strong quarters in 2016. As anticipated, advertisers reacted to our relevance assessment at the end of the second quarter. As a result, the [RPQR] levels normalized. This reaction has led to an improved user experience, which we expect to improve retention going forward.

Id. ¶ 154. Hefer also told analysts that:

> the impact of the relevance assessment that we talked about last quarter already, we saw pretty much the same effect in the second quarter and we expect the revenue per qualified referral to basically go back to old levels. So [we expect]

this positive effect that we had in Q1 and Q2 to go
away for the full third and fourth quarter.

Id. ¶ 163.

Trivago's share price fell $3.98 per share (or 18.6%) on this
news to close at $17.42 at August 4, 2017.  ¶ 164.

### v.  Decreased Revenue Growth Guidance

One month later, on September 6, 2017, Trivago announced a
downward revision of its projected 2017 revenue growth (from 50%
to 40%), citing the fact that "[t]he anticipated negative impact
on RPQR that we discussed on our second quarter 2017 earnings call
has been more significant than previously expected."  Id. ¶ 156.

On the same day, Hefer participated in the Citigroup 2017
Global Technology Conference and explained that "the main impact
that we have seen was the unwinding of the relevance assessment,"
and that "the vast majority of advertisers implemented our
guidelines" by the end of Q2 2017.  Hefer continued that "we
obviously anticipated that that would have a negative impact . .
. Having said that, now looking at two month [sic] of performance
afterwards, it had a bigger impact than we anticipated on the
growth trajectory."  Id. ¶ 167.

Trivago's share price fell $2.44 per share (or 16.3%) on this
news to close at $12.49 at September 6, 2017.  Id. ¶ 168.

### vi.  Third Quarter 2017 Financial Results

On October 25, 2017 – the last day of the Class Period - the
Company announced lackluster third quarter ("Q3") results and

attributed the negative results in part to advertisers' optimization of their websites and bidding strategy in response to the relevance assessment.  Id. ¶ 171.  Trivago further ascribed the Company's Q3 performance to advertisers "adjust[ing] their profitability expectations towards [Trivago] and, therefore, impact[ing] [Trivago's] commercialization."  Id. ¶ 172.  In other words, plaintiffs allege, Priceline and others reduced their bid amounts in retaliation for Trivago attempting to control its landing pages.  Id. ¶¶ 101–103.  As part of the same announcement, the Company further downgraded expected revenue growth to between 36% and 39%.  Id. ¶ 173.

Trivago's share price fell $2.42 per share (or 22.5%) on this news to close at $8.34 at October 25, 2017.  Id. ¶ 174.

F. **Post-Class Period Disclosures**

At the RBC Capital Conference on November 7, 2017, Hefer characterized the relevance assessment as "one of the biggest changes actually that have happened in the recent past on our marketplace."  Id. ¶ 178.  On December 7, 2017, during a meeting with analysts, Hefer displayed a slide of "one large advertiser's revenue share" to demonstrate how the relevance assessment impacted commercialization in Q1 and Q2 2017:



In describing the slide, Hefer stated:

> So what has actually happened in 2017? . . . [W]hat
> we've done here is we basically, we have plotted the
> [revenue] share of our, for some time, largest
> advertiser[12] and used that as a proxy for the
> commercialization of our platform. . . . In 2017,
> what you can't see on here, but it obviously has an
> additional impact, that advertiser had a low
> relevance-assessment score, which made them pay even
> more, which if you would have had a good score, you
> would've resulted in even higher share. So as a proxy
> for commercialization, you would need to make that
> mental adjustment. And then in Q3 and then also in
> Q4, you see basically a return to the old levels.

During the question and answer portion of the same meeting, Hefer

disclosed that the relevance assessment was responsible for more

than 10% of the Company's 68% revenue growth in Q1 2017 and 67%

growth in Q2 2017, respectively.  Id. ¶ 180.

---

[12]     Plaintiff alleges that "largest advertiser" refers to Priceline.
CAC ¶ 179.

## PROCEDURAL BACKGROUND

The initial complaint in this action was filed with Anthony Holbrook as a named plaintiff on October 30, 2017. See Compl., ECF No. 1. On November 7, 2017, a separate case captioned Oliva v. Trivago N.V., No. 17 Civ. 8634 was also filed in this district. After reviewing the three timely filed lead plaintiff applications as required by the Private Securities Litigation Reform Act (PSLRA), see 15 U.S.C. § 78u-4(a)(3)(B)(iii), we appointed Dharmanand Shetty as lead plaintiff, approved his counsel Glancy Prongay & Murray LLP as lead counsel, and consolidated the actions under this caption. See Jan. 22, 2018 Order, ECF No. 20; Mar. 5, 2018 Stipulation and Order, ECF No. 21. Plaintiffs then filed a consolidated amended complaint on March 30, 2018, which remains operative. See CAC, ECF No. 26.

Trivago and the Underwriter Defendants filed respective motions to dismiss the CAC on May 14, 2018. See ECF Nos. 42 and 46. Plaintiffs did not effect service of process upon defendant NCR until July 5, 2018 (the propriety and timeliness of which is disputed), see ECF No. 54, and NCR subsequently filed its own motion to dismiss on August 22, 2018, ECF No. 65. Oral argument was held on February 4, 2019. See Feb. 4, 2019 Hr'g Tr., ECF No. 77.

## DISCUSSION

## I. Insufficient Service of Process

Defendant NCR asserts that the Court should dismiss the CAC on the basis of insufficient service of process pursuant to Rule 12(b)(5) of the FRCP. "The Court considers the jurisdictional issues first, because a dismissal for lack of jurisdiction renders all other claims moot." Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F. Supp. 2d 382, 386 (S.D.N.Y.) (citing Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999)); see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.").

The facts of plaintiffs' service upon NCR are undisputed. Plaintiffs were required to effect service of the summons and pleading upon NCR no later than June 28, 2017. Fed. R. Civ. P. 4(m). While plaintiffs sent NCR a copy of the CAC on June 27, 2018, they did not serve the summons until July 5, 2018, one week after the expiration of the time allowed for service. Plaintiffs concede that their failure to timely serve was without good cause, but urge the Court to grant a discretionary and retroactive one-week extension of time that would render plaintiffs' service of NCR effective as of July 5.

In determining whether a discretionary extension is appropriate in the absence of good cause, district courts generally consider:

(1) whether any applicable statutes of limitations would bar the action once refiled; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether defendant attempted to conceal the defect in service; and (4) whether defendant would be prejudiced by extending plaintiff's time for service.

George v. Prof'l Disposables Int'l, Inc., 221 F. Supp. 3d 428, 435 (S.D.N.Y. 2016). NCR fails to articulate any prejudice suffered as a result of the one-week delay in service of the summons, and in fact NCR had actual notice of the claims asserted against it within 90 days of the filing of the CAC. Moreover, requiring plaintiffs to refile the action would implicate statute of limitations issues, as claims made under Section 11 of the Securities Act must be brought within one year of the discovery of the allegedly untrue statement or omission. 15 U.S.C. § 77m. For these reasons, we find that the factors governing our exercise of discretion weigh in favor of granting plaintiffs' request for a retroactive one-week extension of time for service, and approve plaintiffs' June 27, 2018 service of the CAC and July 5, 2018 service of the summons as effective nunc pro tunc.[13] See PH Int'l

---

[13] In doing so, we reject NCR's argument that plaintiffs' failure to serve the summons together with a copy of the CAC requires dismissal of the action. "The federal courts have not been strict in interpreting the requirement that the summons and complaint be served together. Thus, it has been held that when a copy of the complaint is served with a summons that proves to be defective because of an improper return, a failure to serve an additional copy of the complaint with the second summons does not require dismissal of the suit." 4A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1093 (4th ed.).

The facts here are far more akin to those described in the Wright and Miller treatise than those in any of the cases cited by NCR in support of their argument. See OSRecovery, Inc. v. One Group Int'l, Inc., 234 F.R.D. 59, 60

<u>Trading Corp. v. Nordstrom, Inc.</u>, No. 07 Civ. 10680 (KMK), 2009 WL 859084, at *2 (S.D.N.Y. Mar. 31, 2009).

## II.  Securities Act Claims (Claims I and II)

Plaintiffs' Section 11 and 15 claims are predicated upon Trivago's failure to disclose in the Registration Statement (1) the introduction of the relevance assessment, and (2) that Priceline, its largest advertiser, was violating the Company's landing page standards prior to the IPO. CAC ¶ 106. Plaintiffs argue that Trivago had an independent duty to disclose these facts pursuant to Item 303 of Regulation S-K, and that the Company was further required to disclose them in order to render other representations in the Registration Statement not misleading.

Defendants move to dismiss plaintiffs' claims primarily on three grounds: (1) plaintiffs insufficiently plead that either omitted fact existed at the time of the IPO; (2) plaintiffs fail to establish that Trivago was required to disclose either fact under Item 303; and (3) the alleged omissions did not render any representations in Trivago's Registration Statement misleading.

Before addressing the merits of defendants' arguments, we set forth the standards governing our analysis.

### A. **Pleading Standard under Rule 12(b)(6)**

_____

(S.D.N.Y. 2005) (plaintiffs never served a copy of the summons, with or without a copy of the pleading); <u>DeLuca v. AccessIt Group, Inc.</u>, 695 F. Supp. 2d 54, 66–67 (S.D.N.Y. 2010) (granting plaintiff leave to re-serve where plaintiffs never served a proper summons); <u>Macaluso v. New York State Dep't of Env. Conservation</u>, 115 F.R.D. 16, 18 (E.D.N.Y. 1986) (granting plaintiffs leave to re-serve where plaintiffs never served the complaint after filing).

On a motion to dismiss under Rule 12(b)(6), we must accept as true all factual allegations in plaintiffs' complaint and draw all reasonable inferences in plaintiffs' favor.  City of Providence v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017).  However, we "are not bound to accept as true a legal conclusion couched as a factual allegation," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).  "Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true."  Twombly, 550 U.S. at 555; see also Iqbal, 556 U.S. at 678.  Thus, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face."  If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."[14]  Id.

B. **Section 11 of the Securities Act**

---

[14]    The parties agree that the heightened pleading standards of Rule 9(b) do not apply to plaintiffs' Securities Act claims.  Hr'g Tr. 3:14–16; see also Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) (applying Rule 8 pleading standards to Section 11 claims where, as here, plaintiffs specifically disclaimed reliance on fraud).

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)). "In the event of such a misdeed, the statute provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties. To state a claim under section 11, plaintiffs must allege that "the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" Id. (quoting 15 U.S.C. § 77k(a)).

Plaintiffs alleging actionable omissions under Section 11 must "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." Scott v. Gen. Motors Co., 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014). Moreover, the pleading in such a case "must pass two distinct hurdles: it must identify an omission that is (1) unlawful and (2) material." In re ProShares Tr. Sec. Litig., 728 F.3d 96, 101 (2d Cir. 2013). While materiality is not often dispositive at the motion to dismiss stage, it "remains a meaningful pleading obstacle, and we will dismiss a section 11 claim where the alleged omission was so obviously unimportant to a reasonable investor that reasonable minds would agree on that

25

omission's unimportance." Id. (internal quotation marks omitted).

Omissions are considered material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988).

C. **The Existence of Omitted Facts at the Time of the Offering**

Throughout the CAC, plaintiffs plead the timing of the introduction of the relevance assessment with conspicuous uncertainty. See, e.g., CAC ¶ 67 ("leading up to the IPO, Trivago implemented (or was imminently about to implement) the relevance assessment.").[15] Defendants argue that plaintiffs' indecisiveness precludes a finding that either of the omitted facts were "known or knowable" at the time of the Offering. We disagree. It is undisputed that the relevance assessment was introduced at some point in December of 2016, and the policy was evidently in place long enough to have a non-negligible impact on Trivago's Q4 2016 financial results. See id. ¶¶ 128, 146. Construing the CAC with the requisite liberality (and mindful of the inapplicability of

---

[15]    See also id. ¶ 3 ("near the time of the IPO"); ¶ 12 ("at or around the time of the IPO"); ¶ 60 (at "some (unspecified) point in December 2016"); ¶ 61 ("around the time of the IPO"); ¶ 112 (Trivago "was in the process of changing (or had changed)" its policy at the time of the IPO); ¶ 114 (the relevance assessment was "impending" at the time of the IPO); ¶ 116 (Trivago concealed "the implementation (or impending implementation) of the relevance assessment" in the IPO").

Rule 9(b)'s heightened pleading standards to plaintiffs' Section 11 claims), we find that these facts provide sufficient grounds for inferring that the existence of the relevance assessment was ascertainable prior to the Offering.[16]   With respect to the existence of Priceline's violations of Trivago's landing page standards at some point prior to the Offering, the only argument advanced by defendants is contingent upon the success of the related argument concerning the introduction of the relevance assessment and thus also fails.   See Trivago's Reply Br. at 3 n.2, July 27, 2018, ECF No. 57.

D. **Item 303 of SEC Regulation S-K**

Having adequately pleaded that the omitted facts existed at the time of the Offering, plaintiffs must demonstrate that the omitted facts were either "required to be stated therein or necessary to make the statements therein not misleading."   15 U.S.C. § 77k(a).   Plaintiffs rely exclusively on Item 303 of SEC Regulation S-K as the source of Trivago's independent disclosure obligation.   CAC ¶¶ 109, 110.

Item 303 requires registrants to describe "any known material trends that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales

---

[16]      In any event, we see no meaningful distinction between an allegation that Trivago failed to disclose that it had recently implemented the relevance assessment and an allegation that Trivago had failed to disclose its anticipated, imminent implementation of the same policy for purposes of plaintiffs' Section 11 claim.

or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). This disclosure duty exists "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation." Certain Investment Company Disclosures, Exchange Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

Item 303 "requires the registrant's actual knowledge of the relevant trend or uncertainty." Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 95 (2d Cir. 2016). Moreover, as we explained in In re BHP Billiton Ltd. Sec. Litig., 276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017), the "'reasonably expects will have' standard suggests that there must a fairly substantial probability that the known risk at issue will materialize and have a material impact — if not a more-likely-than-not standard, then something not too much below that." Id.

Given our finding that plaintiffs have adequately pleaded the implementation of the relevance assessment and Priceline's violations of the Company's landing page standards at the time of the Offering, there can be little dispute that Trivago had actual knowledge of the omitted facts. Thus, "the sole remaining issue is whether the effect of the 'known' information was 'reasonably likely' to be material for the purpose of Item 303 and, in turn, for the purpose of Sections 11[.]" Hutchison v. Deutsche Bank

28

Sec. Inc., 647 F.3d 479, 486 (2d Cir. 2011) (quoting Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011)).

>    i. Priceline's Violations of Trivago's Landing Page
>       Standards

In support of its argument that Priceline's non-compliance with Trivago's landing page standards presented a material uncertainty that required disclosure pursuant to Item 303, plaintiffs cite the "flagrant" or "systematic" nature of the violations, Priceline's status as Trivago's largest advertiser, and the fact that the Company ultimately changed its landing page policy to address the issue. CAC ¶ 110; see also Pls.' Opp. to Underwriter Defendants ("UW") Br. at 4-6, June 28, 2018, ECF No. 52. Missing from plaintiffs' pleading, however, is any factual allegation from which to infer that Priceline's non-compliance at the time of the Offering was of the scope and magnitude necessary to impute knowledge of likely materiality. Indeed, the only allegations in the pleading pertaining to the scale of the uncertainty at the time of the Offering are statements made by Schrömgens and Hefer that paint a far more pedestrian picture of Priceline's non-compliance than plaintiffs let on. Schrömgens' explication of advertisers' pre-Offering behavior was limited to a remark that some advertisers were "finding ways around" the prior policy, CAC ¶ 82, while Hefer's comments at a conference in November of 2017 make clear that advertisers had just "started to

test around with different designs" at the end of 2016, id. ¶ 68. Neither permits an inference that Priceline's violations were so severe as to trigger a disclosure obligation under Item 303, even considering Priceline's status as Trivago's largest advertiser. Compare Panther Partners Inc. v. Ikanos Commc'ns, Inc., 347 F. App'x 617, 621 (2d Cir. 2009) ("Panther Partners I") (finding that, without factual allegations that a computer chip manufacturer knew the "scope and magnitude" of defects in its chips at the time of an offering, the fact that the company was aware of defects prior to the offering was insufficient to trigger a duty to disclose under Item 303) with Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 116 (2d Cir. 2012) ("Panther Partners II") (finding proposed amendments sufficient to state a claim because new factual allegations allowed the court to infer that the chip manufacturer knew or should have known that the defect rate would effectively be "100% for all chips sold to clients representing 72% of revenues.").

Further, the fact that Priceline's violations were apparently significant enough to provoke "one of the biggest changes actually that have happened in the recent past on our marketplace," as Hefer put it at a November 2017 conference approximately 11 months after the Company's IPO, is of no moment. The mere fact of a change in policy does not render the impetus for that change material for purposes of Item 303, and Hefer's post hoc description of the

extent of the ultimate impact of the relevance assessment does not speak to what the Company knew or should have known at the time of the Offering.

### ii. The Introduction of the Relevance Assessment

Plaintiffs also argue that the introduction of the relevance assessment was a known trend or uncertainty reasonably likely to have a material impact on Trivago's revenue, citing (1) the fact that under the new policy some of its larger advertisers (including Priceline) would be required to pay a penalty and (2) that the relevance assessment did in fact have an impact on Trivago's Q4 2016, Q1 2017, and Q2 2017 financial results.

We note at the outset that whether Priceline ultimately paid significant relevance assessment fees in Q1 and Q2 2017 is paradigmatic hindsight pleading and therefore insufficient on its own to withstand a motion to dismiss. In re Coty Inc. Sec. Litig., No. 14 Civ. 919 (RJS), 2016 WL 1271065, at *8 (S.D.N.Y. Mar. 29, 2016) ("post-IPO financial results cannot be used to support Plaintiff's Section 11 claim"); In re TVIX Secs. Litig., 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) ("[P]laintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claims cannot be based on a backward-looking assessment of the registration statement." (internal quotation marks omitted)).

With respect to financial results in Q4 2016, plaintiffs'
argument can be favorably construed as suggesting that Trivago
should have known that the relevance assessment would have a
significant impact on future revenues because it had observed
increased revenue attributable to the relevance assessment for (at
most) 15 days in early December. The payment of penalties of
unspecified scale and significance over such a brief period of
time simply does not support conclusions about how or when
advertisers would react to the relevance assessment going forward
from the time of the Offering. Moreover, as plaintiffs concede,
the animus for implementing the relevance assessment was to
incentivize advertisers to conform their landing pages, not to
extract additional revenue from its advertisers in the short term.
Id. ¶ 178. Thus, unless Trivago doubted the efficacy of its own
policy within days of its implementation, the Company in all
likelihood reasonably believed that its advertisers would endeavor
to pay as few penalties as possible, and accordingly that any pre-
Offering increases in revenue attributable to the relevance
assessment were ephemeral. In any event, to the extent that
plaintiffs style Priceline's pre-Offering payments of penalties as
a material "trend" for purposes of Item 303, as a matter of law 15
days does not a trend make. See, e.g., Blackmoss Invs. Inc. v.
ACA Capital Holdings, Inc., 2010 WL 148617, at *10 (S.D.N.Y. Jan.
14, 2010) ("As a matter of law, a two-month period of time does

not establish a 'trend' for purposes of the disclosures required by Item 303."); Nguyen v. MaxPoint Interactive, Inc., 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017); cf. In re Focus Media Holding Ltd. Litig., 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010) ("The case law reflects that courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress." (internal quotation marks omitted)).

Plaintiffs' final argument that the mere implementation of a policy affecting its larger advertisers (including Priceline) gave rise to a duty to disclose fails for the same reason as described above – namely, that there are no pleaded facts to support the notion that any of Trivago's advertisers were "flagrantly" or "systematically" violating the landing page standards to the point of creating a substantial likelihood at the time of the Offering that a change in policy would have a material impact on revenue.[17]

E. **Allegedly Misleading Statements in Registration Statement**

Plaintiffs also argue that the omission of the same two facts identified in connection with plaintiffs' Item 303 claims rendered

---

[17]     Although not pressed in plaintiffs' briefing, the CAC also alleges that Trivago "reasonably expected [that] the relevance assessment . . . presented a substantial risk to Trivago's relationship with its largest advertisers, including Priceline." CAC ¶ 109. Plaintiffs would effectively have this Court ascribe a death wish to Trivago and its managing directors, when, in reality, "it is rather quite implausible" that Trivago would, on its own volition, implement a policy that it believed posed a substantial risk of harming its relationship with its largest advertiser (or, for that matter, presented substantial risks of other negative outcomes that were ultimately realized, like significant increases in the volatility of Trivago's financial results or "substantial slowdown in revenue growth.") CAC ¶ 181; see In re BHP, 276 F. Supp. 3d at 88.

three otherwise truthful statements in the Registration Statement misleading, thus creating a duty to disclose under Section 11 of the Securities Act.  15 U.S.C. § 77k(a).

Plaintiffs are correct that, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014). "But that duty is not boundless." Christine Asia Co. v. Alibaba Grp. Holding Ltd., 192 F. Supp. 3d 456, 471 (S.D.N.Y. 2016), vacated and remanded on other grounds sub nom., Christine Asia Co. v. Ma, 718 F. App'x 20 (2d Cir. 2017).  "[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject," Richman v. Goldman Sachs Group, Inc., 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012), and "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  In re Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).  Moreover, "where there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk."  In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) (citing Hunt v. All. N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 730–31 (2d Cir. 1998)); see also In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 537 (S.D.N.Y. 2015) (statements that "are couched in general terms and make no concrete

representations about" the specific topic at issue are not actionable), <u>aff'd sub nom.</u> <u>Tongue v. Sanofi</u>, 816 F.3d 199 (2d Cir. 2016); <u>In re Vale S.A. Sec. Litig.</u>, 15 Civ. 9539 (GHW), 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017).

The touchstone for a finding that otherwise true statements have been rendered misleading by omissions is "whether such information was necessary in light of the context, manner of presentation, and language of the statements at issue so that what was revealed would not be so incomplete as to mislead." <u>City of Roseville Employees' Ret. Sys. v. Nokia Corp.</u>, No. 10 Civ. 00967 (GBB), 2011 WL 7158548, at *8 (S.D.N.Y. Sept. 6, 2011); <u>see also</u> <u>Kleinman v. Elan Corp., plc</u>, 706 F.3d 145, 153 (2d Cir. 2013) ("veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."); <u>Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.</u>, No. 15 Civ. 5999 (PGG), 2017 WL 4403314, at *11 (S.D.N.Y. Sept. 30, 2017).

### i. Competitive Bidding Process

Plaintiffs first allege that Trivago misled investors when it stated that "[p]ricing is determined through a competitive bidding process whereby advertisers bid on their placement priority for a specific room offer within each room listing." CAC ¶ 11. According to plaintiffs, this description of how Trivago calculates price per click was misleading because "[w]ith the

35

introduction of the relevance assessment, pricing was determined not by a competitive bidding process, but by the bidding process plus the additional penalty imposed by the relevance assessment," id. ¶ 112.

Plaintiffs' argument is out of step with its own pleading, which concedes that "advertisers bid on their placement priority" even after the relevance assessment was introduced, and that any "penalties" paid were a part of the competitive bidding process itself. See, e.g., id. ¶ 64. Moreover, failing to disclose the existence of the relevance assessment (or any other detail of the competitive bidding process) does not render Trivago's broad, non-specific description of pricing - plucked from the middle of a sub-section pertaining to how Trivago recognizes revenue from an accounting perspective - misleading. See In re Bank of Am. AIG Disclosure, 980 F. Supp. 2d at 579; see also DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (a statement's falsity must be "taken together [with other statements] and in context").

ii. Description of Factors Influencing Advertiser Bidding

The second representation at issue appears in a sub-section of the Registration Statement entitled "Revenue per qualified referral (RPQR)":

> [Revenue per referral] is determined by the bids our advertisers submit on our marketplace. The bidding behavior of our advertisers is influenced by the rate at which our referrals result in bookings on

36

> the advertisers' sites, or booking conversion, and
> the amount our advertisers obtain from referrals as
> a result of hotels booked on their sites, or booking
> value, and the degree to which advertisers are
> willing to share the overall booking value, or
> revenue share. . . . In early 2015, we changed our
> marketplace mechanics by introducing hotel-level CPC
> bidding. The change provides more flexible pricing
> options that allow advertisers to determine their
> CPCs for each hotel, rather than choosing from a
> pre-determined selection of possible CPCs for each
> hotel. Our current mechanism gives our advertisers
> the flexibility to optimize their bidding strategy,
> which we believe leads to a more efficient
> marketplace.

Gerber Decl. Ex. 1 at 73; CAC ¶¶ 113–14. Plaintiffs argue that "Trivago presented a bidding process that did not charge its largest customer special penalties for its non-compliant landing pages," and that "penalties associated with the relevance assessment w[ere] a factor that influenced its advertisers' bidding behavior," including the bidding behavior of its largest advertiser. Pls.' Opp. to UW Br. at 10.

Cutting through Trivago's liberal employment of corporate jargon, the Company describes textbook economic principles as elementary as "supply and demand" in disclosing that advertisers' bidding behavior is influenced by how much money the advertisers make from their listings and how much of that profit they are willing to share with Trivago. These principles apply equally to all advertisers, regardless of whether or not their landing pages comply with Trivago's policies, and remained true even after the implementation of the relevance assessment. The observation that

37

Trivago's revenue was influenced by how much its advertisers were willing to compensate the Company simply does not trigger a generalized duty to disclose all of the details of how Trivago regulates the landing pages of its advertisers. See In re Morgan Stanley, 592 F.3d at 366.

In so finding, we emphasize that this is not an instance where a corporation chooses to speak about a topic and "has a duty to be both accurate and complete." In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) (internal quotation marks omitted). There are no allegations that Trivago made any representations whatsoever about its prior approach to regulating the landing page policies of its advertisers, and a duty to disclose does not spring solely from plaintiffs' interest in that omitted fact. See In re Time Warner, 9 F.3d at 267. The cases cited by plaintiffs in support of their argument only serve to underscore the requirement that a corporation speak on a topic before being obligated to disclose details relating to that topic. See Bristol Myers Squibb, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (finding Bristol-Myers' failure to disclose that it had negotiated away important patent rights for a specific product actionable where the company continued making public statements that it would "vigorously pursue" patent litigation with respect to that specific product) ("Thus, while the market believed that Bristol-Myers maintained its full arsenal of statutory weapons, in reality,

it had secretly agreed to an arms limitation."); <u>S.E.C. v. Gabelli</u>, 653 F.3d 49 (2d Cir. 2011) (a mutual fund's generally true statements about its attempts to eliminate a specific manipulative practice were rendered misleading by the fact that the mutual fund managers had, at the same time, expressly (and deceptively) allowed a single investor to engage in the very same manipulative practice); <u>Sanofi</u>, 87 F. Supp. 3d at 537 (general statements that Sanofi was preparing for a global product launch and had "significant new medicines" entering the worldwide market were not rendered misleading by a failure to disclose that that product would not be launching in the United States).

### iii. <u>Historical Growth Rates</u>

Finally, plaintiffs argue that Trivago misled investors by omitting the relevance assessment from a non-exclusive list of factors that could cause Trivago to downwardly deviate from its historical growth rates. CAC ¶ 116. As an initial matter, plaintiffs' argument that the introduction of "one of the single most important factors that would influence revenue <u>growth</u>," <u>id.</u> ¶ 116 (emphasis added), was required to be included in a list of factors that could <u>decrease</u> revenue vis-à-vis historical growth rates is nonsensical, given that the relevance assessment was expected to (if anything) temporarily increase revenue above historical rates. <u>See, e.g.</u>, <u>id.</u> ¶ 15 (Trivago "omitted that it

was expected to be a short-term boost that would instantly end once Priceline complied with Trivago's new guidelines.").

Even if the relevance is properly considered a factor that could decrease revenue growth below Trivago's historical rates, "when an issuer chooses to make a non-inclusive list, that list need not be exhaustive." Dingee v. Wayfair Inc., No. 15 Civ. 6941 (DLC), 2016 WL 3017401, at *5 (S.D.N.Y. May 24, 2016). Here, Trivago made clear that growth rates could decline for "any number of reasons, including" those listed in the prospectus.

Lastly, these statements are couched in sufficiently general terms so as to obviate any duty to disclose (e.g., "decreased user spending," "emergence of alternative business models," etc.). Trivago did not engage in a selective listing of specific company policies that may impact revenue and trigger a duty to provide investors with all company policies affecting growth.

Because plaintiffs have failed to adequately plead that Trivago had a duty to disclose omitted facts in connection with its Registration Statement,[18] we find that plaintiffs have failed

---

[18]     Plaintiffs' Section 10(b) claims based upon these statements and the substantially identical statements contained in Trivago's 2016 annual report fail for the same reasons as described supra, as the test for whether a representation is materially misleading is the same under Section 10(b) as it is under Section 11. See Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004); see also ¶¶ 132, 134, 136; Gerber Decl. Ex. 3 (2016 20-F excerpt) at 40.

to state a claim under Section 11 of the Securities Act and grant defendants' motions to dismiss Claim I as to all defendants.[19]

F. **Section 15 of the Securities Act**

Section 15 of the Securities Act provides for "control person" liability and requires that a plaintiff show (1) a primary violation of the Securities Act and (2) "control" by the defendant. See Rombach v. Chang, 355 F.3d 164, 177–78 (2d Cir. 2004). Because plaintiffs have failed to plead a primary violation of Section 11 on the part of any defendant, their Section 15 claims against the Individual Defendants necessarily fail and we dismiss Claim II. Rombach v. Chang, 355 F.3d 164, 177–78 (2d Cir. 2004); see also Hecht, 897 F.2d at 26 n.6.

III. **Exchange Act Claims (Claims III and IV)**

Plaintiffs bring their Exchange Act causes of action solely against the Trivago Defendants, claiming that, despite Trivago's consistent ascriptions of revenue growth to the relevance assessment and accompanying cautionary language, the Company was less than fully forthright regarding the nature and scope of the relevance assessment's impact. Trivago moves to dismiss these

---

[19] Although the Individual Defendants have not appeared in this action, we also dismiss Claim I as to the unserved and non-moving Individual Defendants "because the issues concerning [the non-moving defendants] are substantially the same as those concerning the other defendants, and [plaintiffs] had notice and a full opportunity to make out [their] claim[.]" Hecht v. Commerce Clearing House, 897 F.2d 21, 26 n.6 (2d Cir. 1990); see also Alki Partners, L.P. v. Vatas Holding GmbH, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011), aff'd sub nom. Alki Partners, L.P. v. Windhorst, 472 F. App'x 7 (2d Cir. 2012); Wachtler v. County of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994). The same reasoning applies to Claims II, III, and IV, discussed infra.

claims on the grounds that plaintiffs have failed to adequately plead that Trivago made any material misrepresentations or omissions and have not plausibly alleged any facts giving rise to an inference of fraudulent intent.

We again describe the applicable legal standards before addressing the sufficiency of plaintiffs' stated causes of action.

A. **Section 10(b) of the Exchange Act**

Section 10(b) of the Exchange Act prohibits the use or employment of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security and in contravention of rules and regulation prescribed by SEC. 15 U.S.C.A. § 78j(b). SEC Rule 10b-5, promulgated thereunder, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To sustain a private cause of action under section 10(b) and Rule 10b-5(b), "a plaintiff must [adequately plead] (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation." <u>Halliburton Co. v. Erica P. John Fund, Inc.</u>, 537 U.S. 258, 267 (2014) (internal quotation marks omitted).

In stating a claim under Section 10(b), plaintiffs must also satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA. Fed. R. Civ. P. 9(b); Pub.L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of Title 15 U.S.C.); <u>see</u> <u>ATSI</u>, 493 F.3d at 99. In order to satisfy Rule 9(b), plaintiffs making allegations of misrepresentations or omissions under Rule 10b-5(b) must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004).

"The PSLRA expanded on the Rule 9(b) standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Anschutz Corp. v. Merrill Lynch & Co.</u>, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks and alterations omitted) (citing <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 345 (2005)).

B. **Material Misstatements or Omissions**[20]

   i. <u>Announcement of Q4 2016 Financial Results</u>

First, plaintiffs argue that Trivago's February 24, 2017 disclosures relating to the Company's algorithm change and annual revenue growth projection were rendered misleading because Trivago failed to disclose the existence of the relevance assessment by name or that the new policy presented a risk that advertisers would conform their landing pages and stop paying penalties. Pls.' Opp. to Trivago Br. at 11; <u>see also</u> CAC ¶¶ 123–25, 127–28, 130. The most obvious defect in plaintiffs' argument is that Trivago ascribed its Q4 2016 revenue growth to a change in its marketplace algorithm and disclosed that the sustainability of the resulting "improved commercialization" was contingent upon how advertisers reacted to the change. <u>See</u> Gerber Decl. Ex. 2, ECF 43-2 at 6–7. Absent an adequate explanation of how further disclosure of facts known or knowable as of February 24, 2017 was necessary to correct a false impression, or why a reasonable investor would view such additional information (<u>e.g.</u>, the name of the new policy) as significantly altering the total mix of information available, we reject plaintiffs' argument that they were entitled to more specificity for specificity's sake. <u>Basic Inc.</u>, 485 U.S. at 232;

---

[20]    As discussed <u>supra</u>, the test for whether a statement is materially misleading is the same under Section 10(b) as it is under Section 11, and we hereby incorporate by reference our discussion of the relevant legal principles from Section II. <u>See</u> <u>Rombach</u>, 355 F.3d at 172 n.7.

see also <u>Richman</u>, 868 F. Supp. 2d at 273 ("The requirement to be complete and accurate" only requires disclosure of facts "that are needed so that what was revealed would not be so incomplete as to mislead." (internal quotation marks and ellipses omitted)). Because "[t]he allegedly omitted facts were either disclosed or implied in the [Q4 2016 CC]," plaintiffs fail to plead a false or misleading representation. <u>See also</u> <u>Halperin v. eBanker USA.com, Inc.</u>, 295 F.3d 352, 361 (2d Cir. 2002).

ii. <u>April 27, 2017 Updated Guidance</u>

Plaintiffs also take issue with Trivago's April 27, 2017 press release announcing updated revenue growth guidance: "With a strong focus on improving our hotel search product and market leading innovation, we look forward to reporting our financial results on May 15, 2017. Given our strong start to the year, we have increased our full-year guidance . . . ." CAC ¶ 138. Plaintiffs argue that Trivago failed to disclose that the "strong start" in 2017 was not driven by "improving [its] hotel search product" or "market leading innovation," but rather the implementation of the relevance assessment. <u>Id.</u> ¶ 139. Trivago's amorphous attributions of growth to "improvement" and "innovation," which "are couched in general terms and make no concrete representations" about any specific acts, practices, or policies, are not actionable, particularly when they are made within the context of a two-sentence press release announcing the Company's future growth projections. <u>In re</u>

45

Sanofi, 87 F. Supp. 3d at 537.  More fundamentally, the relevance assessment can fairly be considered both an improvement to Trivago's search product and an example of innovation.

### iii. Announcement of Q1 2017 Financial Results

With respect to statements made in connection with the release of the Company's Q1 2017 quarterly results, plaintiffs' primary objections amount to little more than quibbles with Trivago's word choice.  See CAC ¶¶ 140–141 (Q1 RPQR growth was "largely driven by the introduction of a relevance assessment," as opposed to "entirely driven")[21]; ("In some cases, advertisers have compensated for their lower relevance assessments through higher cost-per-click bids," as opposed to "the relevance assessment was impacting Priceline").  Plaintiffs' hyper-literal reading of Trivago's disclosures borders on the silly, and we have no difficulty concluding that the Company adequately conveyed the sum and substance of the relevance assessment's scope and impact in the Q1 2017 PR and CC.  Having done so, Trivago "need not characterize or editorialize on those facts in any particular way."[22]  Kramer v.

---

[21]     Plaintiffs rely on Hefer's December 2017 disclosure that the relevance assessment was responsible for at least 10% of Trivago's overall revenue in the first half of 2017 in calculating that both Q1 and Q2 RPQR growth would have fallen from 4% to negative 2% absent the implementation of the relevance assessment.  CAC ¶¶ 80, 86.

[22]     A similar disclosure made by Trivago in connection with the announcement of their Q2 2017 results is not actionable for the same reasons. See id. ¶ 150 (relevance assessment was "one of the drivers" of Q2 2017 RPQR growth, as opposed to the "entire driver").

<u>Time Warner, Inc.</u>, No. 89 Civ. 8234 (LBS), 1990 WL 166665, at *3 (S.D.N.Y. Oct. 24, 1990) (internal quotation marks omitted).

Plaintiffs' also complain that Schrömgens misled investors when he supposedly stated on the Q1 2017 CC that (1) non-compliant advertisers were banned from the Trivago marketplace (while failing to acknowledge that certain non-compliant advertisers (like Priceline) were allowed to participate) and (2) the relevance assessment was introduced to create flexibility, rather than to restrict Priceline.  CAC ¶¶ 144–145.  With respect to the former, plaintiffs provide an example of what this Court would consider a misleading omission by failing to acknowledge Schrömgens' disclosure on the same call that "advertisers were even finding ways around" the prior policy.  <u>Compare</u> <u>id.</u> ¶ 145 <u>with</u> <u>id.</u> ¶ 82. In terms of the latter, a plain reading of the unedited call transcript makes clear that Schrömgens merely observed that the relevance assessment gave advertisers more flexibility, not that increased flexibility was the motivation for introducing the relevance assessment.  <u>See</u> Gerber Ex. 5 at 3; <u>see also</u> <u>Lopez</u>, 173 F. Supp. 3d 12, 41 (S.D.N.Y. 2016).

Finally, Hefer's commentary in announcing Trivago's annual revenue growth guidance, in which he cautioned investors that "the positive effect that we saw in Q4 and Q1 will be partially mitigated in 2017," CAC ¶ 146, was not rendered misleading for failing to include explicit reference to the relevance assessment.

As plaintiffs are well aware, Trivago had already disclosed that revenue growth in Q1 was "largely driven by the introduction of a relevance assessment" and that "as advertisers optimize their websites and bidding strategy, these positive revenue effects will be partially mitigated over time." Id. ¶ 140; see also DeMaria, 318 F.3d at 180. Beyond making these disclosures, Trivago was under no obligation to "quantify the precise impact the information will have on [Trivago's] future financial results." City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc., No. 10 CIV. 2835 NRB, 2011 WL 4357368, at *19 (S.D.N.Y. Sept. 19, 2011).

### iv. July 27, 2017 Updated Guidance

In an affirmation of previously announced revenue growth guidance, Trivago issued a press release on July 27, 2017 stating: "As we continue to focus on growth and long-term value creation, we look forward to reporting our financial results on August 4, 2017. In light of our expectations for the year, we confirm our previously communicated full-year guidance and continue to expect annual revenue growth to be around 50% in 2017." CAC ¶ 148. A reference to "long-term value creation" does not trigger a duty to explicitly reference the relevance assessment - the existence and impact of which had already been fully disclosed months earlier.

Moreover, to the extent that plaintiffs' claims are predicated on a failure to disclose the relevance assessment's Q2 2017 impact prior to the Company's announcement of its Q2 2017

financial results, we have previously dismissed similar claims as "the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain." In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25, 2003); see also Arfa v. Mecox Lane Ltd., No. 10 Civ. 9053, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012), aff'd, 504 Fed. Appx. 14 (2d Cir. 2012) (finding that a company has no general "obligation to disclose the results of a quarter in progress."); In re Focus Media Ltd. Litig., 701 F. Supp. 2d at 539 (rejecting effort "to hold Defendants liable for [their] failure to disclose financial information about the third quarter before that quarter had concluded.").

> ### v. Announcement of Q2 2017 Financial Results

In an search for actionable misstatements in Trivago's Q2 2017 PR and CC, plaintiffs unconvincingly take umbrage with the Company's use of the terms "deceleration," "reacted," and "normalized," claiming that such characterizations understated the decrease in revenue Trivago expected and "conceal[ed] the far more serious underlying reality" that Priceline had begun complying with the Company's landing page standards towards the end of Q2. See CAC ¶¶ 154–55 ("We expect a deceleration of growth in the second half compared to very strong quarters in 2016. As anticipated, advertisers reacted to our relevance assessment at the end of the second quarter. As a result, the Revenue per

Qualified Referral levels normalized."). Trivago, however, is not required to "present an overly gloomy or cautious picture of current performance and future prospects," <u>Novak v. Kasaks</u>, 216 F.3d 300, 309 (2d Cir. 2000), and plaintiffs' objections again amount to nothing more than improper quibbles with Trivago's wording. <u>In re ProShares</u>, 728 F.3d at 103. There is no reason here to substitute plaintiffs' own "linguistic preference[s]" for those of the Company's, and we decline to "attribute to investors a child-like simplicity" by presuming their incapacity to comprehend the basic meaning of plain English terms. <u>See</u> <u>id.</u>

Further, plaintiffs' argument that Trivago violated Section 10(b) by failing to disclose that "RPQR was well on its way to a massive decline for Q3 2017" in the middle of the quarter is improperly premised on a theory of fraud by hindsight and must be rejected. <u>See</u> <u>Duane Reade Inc.</u>, 2003 WL 22801416, at *10.

vi. <u>September 6, 2017 Updated Guidance</u>

Finally, plaintiffs' allegations relating to Trivago's September 6, 2017 announcement that "[t]he anticipated negative impact on RPQR that we discussed on our second quarter 2017 earnings call has been more significant than previously expected" fails for many of the same reasons that we noted in addressing Trivago's prior disclosures. CAC ¶ 156. We add that, without making any non-conclusory allegations that the negative impact was not, in fact, "more significant" than anticipated at the time the

50

statement was made, plaintiffs fail to adequately plead falsity. See generally Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (plaintiffs cannot "seize upon disclosures made in later annual reports and allege that they should have been made in earlier ones."). Moreover, plaintiffs' again rely in part on a non-existent duty to disclose financial trends (in this case, Priceline beginning to pull back its advertising in Q3 2017) mid-quarter. See Duane Reade Inc., 2003 WL 22801416, at *10.[23]

For all of the foregoing reasons, we conclude that the CAC does not allege any actionable misrepresentations or omissions.

C. **Scienter**

Even assuming, arguendo, that plaintiffs had adequately alleged actionable misstatements or omissions, their manifest failure to plead facts giving rise to any inference of scienter, let alone a strong one, provides an independent ground upon which to dismiss their Section 10(b) claims.

The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2). "The

---

[23] Plaintiffs also argue that Trivago's reported revenue, net income, and RPQR figures themselves were misleading "because they failed to disclose, and thus concealed, that their growth was driven, in part or in whole, by the introduction of the relevance assessment." CAC ¶ 126; see also id. ¶¶ 123–125, 142, 152. As the accuracy of the reported figures are not in dispute, Trivago's announcements of quarterly financial results are not actionable under the federal securities laws. See In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) ("The disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."); In re Duane Reade, 2003 WL 22801416, at *6.

requisite state of mind in a Section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co. ("ECA"), 553 F.3d 187, 197 (2d Cir. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)). The inference must be more than merely reasonable or permissible; it must be "cogent and compelling," i.e., "strong in light of other explanations." Tellabs, 551 U.S. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

A strong inference of fraud may be established by alleging facts demonstrating: "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, 553 F.3d at 198; see also S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (defining recklessness as conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.") (internal quotation marks and alteration omitted). Where, as here, plaintiffs do not make a

showing of motive,[24] "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." See ECA, 553 F.3d at 198–99 (citing Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

In the Second Circuit,

> at least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

Id. at 199. Plaintiffs do not make any allegations with respect to the (1), (2), or (4), relying exclusively on allegations that Trivago defendants "knew facts or had access to information suggesting that their public statements were not accurate." Id. at 198.

Given the nature of plaintiffs' theory of scienter, their abject failure to identify any reports or statements containing adverse facts that defendants had access at the time the statements at issue were made is itself fatal to plaintiffs' Section 10(b) claims. Novak, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically

---

[24] Nor could they, as "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." ECA, 553 F.3d at 198.

identify the reports or statements containing this information."). Put simply, plaintiffs failed to establish "what the [d]efendants knew and when they knew it." Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 176 (S.D.N.Y. 2010).

In an a rather desperate attempt to evade this requirement, plaintiffs ask the Court to presume knowledge of falsity because (1) the impact of the relevance assessment was calculable and therefore defendants must or should have known that it was responsible for *all* of Trivago's Q1 and Q2 2017 RPQR growth (as opposed to *most* of the growth, as Trivago disclosed to investors), (2) the relevance assessment constitutes a "core operation" of Trivago, and (3) Trivago failed to mention the relevance assessment by name in its Q4 2016 announcement. See Pls.' Opp. to Trivago Br. at 21–24.

With respect to (1), plaintiffs hang their hats on two comments that Hefer made at a conference in November of 2017 (nearly a year after the introduction of the relevance assessment) suggesting that the impact of the relevance assessment was a calculable figure, as well Trivago's disclosure that its Q1 2017 RPQR growth was "largely driven" by the introduction of the relevance assessment (thus suggesting that Trivago was, in fact, calculating its impact). The patent absurdity of asking the Court to infer scienter from Trivago's disclosure that revenue growth was "largely driven" by the very policy it was supposedly

concealing raises a broader issue with plaintiffs' theory of scienter – namely, the cascade of disclosures clearly identifying the relevance assessment and the ample cautionary language employed by the Company throughout the Class Period in warning investors of the risks attendant to its implementation. To put it mildly, "[d]efendants' disclosures about the risk . . . are inconsistent with a state of mind going toward 'deliberate illegal behavior' or 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'" Footbridge Ltd. v. Countrywide Home Loans, Inc., No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *20 (S.D.N.Y. Sept. 28, 2010). In any event, the mere fact that the impact of the relevance assessment was calculable is woefully inadequate grounds for purposes of scienter, particularly where, as here, plaintiffs fail to adequately allege motive. ECA, 553 F.3d at 198–99.

Plaintiffs also invoke the "core operations doctrine," which provides that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); see generally Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989). The Second Circuit has not decided whether the

"core operations" doctrine remains valid as a theory of scienter following the PSLRA, see Frederick v. Mechel OAO, 475 F. App'x 353, 356 (2d Cir. 2012) (declining to decide whether "the 'core operations' doctrine survives as a viable theory of scienter" following the PSLRA), but, regardless of its viability, the doctrine contributes little to the scienter analysis here. For one, the majority rule is to "consider the 'core operations' allegations to constitute supplementary, but not an independent, means to plead scienter." Schwab v. E*TRADE Fin. Corp., 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017) (Koeltl, J.) (internal quotation marks omitted); see, e.g., In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 352-53 (S.D.N.Y. 2011) (Sullivan, J.) (considering "core operations" allegations as "supplementary but not independently sufficient"). In the utter absence of any other evidence of fraudulent intent, the doctrine itself is insufficient to give rise to the necessary inference.[25]

Finally, plaintiffs suggest that Trivago's failure to disclose the relevance assessment by name in its Q4 2016 results supports an inference of scienter. Plaintiffs rely almost entirely on Hefer's December 2017 commentary that the introduction of the

---

[25]     In any event, "courts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine,'" Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011), and the CAC alleges that Priceline was only responsible for less than 45% of Trivago's revenues during the relevant time period.

relevance assessment was "one of the biggest changes" to Trivago's marketplace "in recent past" to suggest that Trivago knew this at the time and still chose not to disclose the existence of the relevance assessment by name. CAC ¶ 68. But, as discussed supra, Hefer's post hoc description of the impact that the relevance assessment ultimately had on the Company impermissibly alleges fraud by hindsight and does not speak to whether any defendant believed that the relevance assessment was "one of the biggest changes" at the time the Company's Q4 2016 financial results were announced. Moreover, the inference proposed by plaintiffs is undercut by Trivago's aforementioned disclosures that Q4 2016 growth was attributable to "improved commercialization" (a reference to the relevance assessment) and that the benefits of that improved commercialization may disappear over time.

Plaintiffs' scattered attempt to string together an inference of scienter from these stray threads is plainly insufficient for purposes of stating a claim under Section 10(b). Although we need not undertake a competing inference analysis under Tellabs because we find that plaintiffs have alleged no facts establishing strong circumstantial evidence supporting an inference of scienter, Tyler, 814 F. Supp. 2d at 344 n.18, we nevertheless observe that any semblance of an inference of fraudulent intent raised by plaintiffs is rendered implausible by Trivago's numerous and fulsome disclosures made throughout the Class Period, and is

therefore neither as cogent nor as compelling as an opposing inference of non-fraudulent intent.

D. **Section 20 of the Exchange Act**

Finally, plaintiffs allege that the Individual Defendants are liable under Section 20(a) of the Exchange Act because they acted as "controlling persons" of Trivago who participated in the alleged securities fraud.  CAC ¶¶ 225–230.  To establish a prima facie case of control-person liability under sections 20(a), plaintiffs must sufficiently allege a primary violation by the controlled entity.  See <u>ATSI</u>, 493 F.3d at 108.  Because plaintiffs have failed to plead a primary violation by Trivago, their Section 20(a) claims necessarily fail.  See <u>Slayton v. Am. Exp. Co.</u>, 604 F.3d 758, 778 (2d Cir. 2010).

## CONCLUSION

For the foregoing reasons, NCR's motion to dismiss for insufficient service of process pursuant to Rule 12(b)(5) is denied, and defendants' motions to dismiss for failure to state a claim pursuant Rule 12(b)(6) are granted in their entirety and with prejudice.  We also dismiss the CAC as to the unserved and non-moving Individual Defendants "because the issues concerning [the non-moving defendants] are substantially the same as those concerning the other defendants, and [plaintiffs] had notice and a full opportunity to make out [their] claim[.]"  <u>Hecht</u>, 897 F.2d at 26 n.6.

Although plaintiffs make a perfunctory request for leave to amend in their opposition brief [Pls.' Opp. to Trivago Br. at 25], they do so in conclusory fashion without providing an adequate explanation of what they would allege in a second consolidated amended complaint to cure the CAC's deficiencies, and we therefore deny their request. See Campo v. Sears Holdings Corp., 371 F. App'x 212, 218 (2d Cir. 2010) (summary order) (upholding denial of leave to amend where "plaintiffs provide[d] no explanation of what they would allege in an amended complaint to save their claims"); see also Metz v. U.S. Life Ins. Co. in City of New York, 662 F.3d 600, 603 (2d Cir. 2011).

The Clerk of Court is respectfully directed to enter judgment for defendants and terminate this case and any motions pending therein.

**SO ORDERED.**

Dated:   New York, New York
         February 26, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE